UNITED STATES of America, Plaintiff,

v.

**Shu Yan ENG, also known as Ah Shu, Defendant.**

No. CR–89–678.

United States District Court, E.D. New York.

March 31, 1993.

Patricia Pileggi, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Margaret E. Alverson, Peluso Touger and Alverson, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

On March 26, 1991, this court denied defendant Shu Yan Eng's motion to suppress certain illegally seized financial records on the ground that the challenged evidence fell within the "inevitable discovery" exception to the exclusionary rule enunciated by the Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). After conviction for tax evasion, defendant appealed this court's denial of his motion to the Second Circuit. In an order dated July 28, 1992, the court of appeals vacated the suppression ruling and remanded the case for "particularized findings" as to how discov-

ery of "each piece of evidence challenged by Eng and claimed by the government to be admissible" " 'would have been' more likely than not 'inevitable' absent the search of Eng's safe." *United States v. Eng*, 971 F.2d 854, 862 (2d Cir.1992). Those "particularized findings" are provided, and this court reaffirms its initial conclusion that the majority of evidence challenged by defendant Eng fell within the parameters of *Nix v. Williams* and its progeny. Recognizing that the government failed to satisfy its burden of proof as to some of the evidence admitted at trial, this court nevertheless finds that the paucity of evidence incorrectly presented to the jury would not have changed the trial outcome and therefore constituted harmless error.

## FACTS

The Second Circuit opinion in this case, *United States v. Eng*, 971 F.2d 854 (2d Cir. 1992), sets forth the pertinent facts leading up to and following defendant's arrest and conviction, and familiarity with that decision is presumed. However, in order to memorialize the detailed exposition necessitated by the Second Circuit's vacatur and remand, this court includes in this opinion such other information as was relevant to its determination that the government ultimately would have discovered, by lawful means, the evidence challenged by Eng. In addition, where appropriate, inaccuracies and additions to the factual analysis reflected in the opinion of the court of appeals are included. The discussion and conclusions which follow rest on this court's observation of Agent Interdonato's demeanor, on an assessment of his testimony at the suppression hearing, and on a close examination of the transcript and exhibits from that hearing.[1]

In February of 1989, the Drug Enforcement Administration ("DEA") and the Internal Revenue Service ("IRS") began investigating Shu Yan Eng for violations of various narcotics and money laundering statutes. Information from confidential informants that Eng was importing large quantities of narcotics from the Far East and laundering the money from this narcotics trade through various businesses and properties in the

---

1. References to the suppression hearing transcript are denoted *"Tr."*; exhibits from that hearing and from trial are denoted "GX" for government's exhibit and "DX" for defense exhibits.

United States provided the impetus for these initial investigations. Several months later—in August or September of 1989—the IRS commenced a tax evasion investigation of Eng. *Tr.* at 78. Although tax investigations customarily follow commencement of narcotics and money laundering investigations, *Eng*, 971 F.2d at 856, in this case the "precipitating fact" that led the government to delve into defendant's tax activity was Eng's purchase of a building at 26 Bowery on behalf of a corporation over which he presided. *Tr.* at 78–79. IRS Special Agent Thomas Interdonato, assigned to the DEA Southeast Asian Task Force, discovered Eng's purchase of this property through an examination of public records in the summer of 1989; Interdonato thereafter took primary responsibility for the tax investigation. *Tr.* at 78–79.

In conducting this tax evasion investigation of Shu Yan Eng, Interdonato used the "tax expenditures" method of proof, which essentially compares the taxpayer's income and non-taxable resources, such as gifts and loans, with the taxpayer's expenditures. *Tr.* at 3–4. In order to prove tax evasion by this indirect method, the government must show to a "reasonable probability" that non-taxable sources of funds spent by the taxpayer did not exist, a burden that involves a "thorough search of assets, sources of money, and cash inflows and outflows." *Eng*, 971 F.2d at 856 (citing *United States v. Bianco*, 534 F.2d 501 (2d Cir.), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)). The materials that Interdonato gathered in connection with the initial phase of his investigation are discussed in detail below.

On October 18, 1989, Eng was arrested pursuant to a grand jury indictment charging him with administration of a continuing criminal enterprise, money laundering, and various narcotics violations. Lawfully seized from Eng's person at the time of his arrest were American Express Cards, three vehicle registrations, a social security card, a life insurance card, a driver's license, and several business cards. *Tr.* at 177; GX 357. In addition, on the day of defendant's arrest, law enforcement authorities took possession of two of his business properties: the 26 Bowery building, mentioned above as the impetus for the tax investigation, and the French Ice Cream Parlor. A search of Eng's personal safe in the French Ice cream parlor ensued, and a variety of materials—also discussed below—were seized from that safe. The government concedes that the search and seizure of the safe were conducted without a warrant and were thus unlawful. *Tr.* at 184.

In April of 1990, approximately six months after the illegal search and eight months after Interdonato's tax evasion investigation commenced, a superseding indictment was handed up. That indictment added to the existing charges against Eng three tax evasion counts relating to the tax years 1986 through 1988. Eng then moved to suppress various financial documents seized in the search of the French Ice Cream Parlor safe and evidence allegedly derived from the seized materials, contending that this evidence was tainted by the illegal search and therefore could not be admitted at trial to support the tax evasion counts. After holding a suppression hearing, at which Agent Interdonato was the only witness, reading the parties' briefs and proposed findings of fact, and examining *Nix v. Williams* and its progeny, this court determined that the government had met its burden of proof under the "inevitable discovery" doctrine by demonstrating that it was more likely than not that the government would have discovered the challenged evidence even absent the illegal search. Defendant's motion to suppress was therefore denied, and, as expected, the government introduced many of the challenged documents into evidence at Eng's trial.

In April of 1991, a jury convicted Eng on all three tax evasion charges but acquitted him on all other counts. Eng thereafter appealed this court's suppression ruling to the Second Circuit which, as already mentioned, vacated the determination that the inevitable discovery doctrine applied generally to all the seized evidence and remanded the case for particularized findings of fact. The remainder of this opinion complies with that remand as follows: first, it discusses the relevant "inevitable discovery" law in the Second Circuit; second, it explains how the inevitable discovery doctrine relates to the particular investigation against Eng; third, it describes the evidence that the government

presented at trial to support Eng's conviction on tax evasion; and fourth, it analyzes in detail each of the challenged pieces of evidence—in accordance with the Second Circuit's mandate—to explain why the majority of that evidence falls within the inevitable discovery exception to the exclusionary rule.

## DISCUSSION

### I. The Inevitable Discovery Doctrine
#### A. Nix v. Williams

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, Weeks v. United States, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652] (1914), and of testimony concerning knowledge acquired during an unlawful search, Silverman v. United States, 365 U.S. 505 [81 S.Ct. 679, 5 L.Ed.2d 734] (1961)." Murray v. United States, 487 U.S. 533, 536, 108 S.Ct. 2529, 2532, 101 L.Ed.2d 472 (1988). In the oft-quoted words of Wong Sun v. United States, 371 U.S. 471, 484–84, 83 S.Ct. 407, 414–15, 9 L.Ed.2d 441 (1963), the exclusionary rule also bars introduction of derivative evidence—"fruit of the poisonous tree"—unless the relationship between that evidence and the search is sufficiently attenuated:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

Id. at 487–88, 83 S.Ct. at 417–18. The rationale of the inevitable discovery doctrine evolved from this quotation. See Nix v. Williams, 467 U.S. 431, 441–43, 104 S.Ct. 2501, 2507–09, 81 L.Ed.2d 377 (1984); see also United States v. Alvarez–Porras, 643 F.2d 54, 59 (2d Cir.) (citing language from Wong Sun and explaining that "[i]n applying the exclusionary rule, a trial court must focus on the existence of 'exploitation' of the 'primary illegality.' '[T]he primary issue [is] whether the unlawful police behavior bore a causal relationship to the acquisition of the challenged testimony.' ... Even if 'the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation, ... the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' ") (citations omitted) (emphasis in original), cert. denied, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); United States v. Falley, 489 F.2d 33, 40–41 (2d Cir. 1973) (citing language from Wong Sun to hold "[i]t would have been only a question of time before the government by a so-called saturation investigation, or otherwise, would have discovered the ... documents. Even if the address book had shortened or facilitated the investigation it did not supply fruit sufficiently poisonous to be fatal.").

The inevitable discovery exception to the exclusionary rule allows admission of unlawfully obtained evidence at trial when the government demonstrates that discovery of that evidence by legitimate means was "inevitable." Nix, 467 U.S. at 444, 104 S.Ct. at 2509; United States v. Gorski, 852 F.2d 692, 695 (2d Cir.1988). Illustration of what has been deemed "inevitable" is essential to comprehending and applying the doctrine. In the seminal Supreme Court case on inevitable discovery, Nix v. Williams, police officers elicited incriminating statements from the defendant which, in turn, led them to the body of his murder victim, a ten-year-old girl named Pamela Powers. Although an earlier Supreme Court appeal found the defendant's admissions to be the product of unconstitutional custodial interrogation, the Nix Court nevertheless held that evidence of the location and condition of the girl's body was properly admitted at defendant's retrial. Id. 467 U.S. at 449–50, 104 S.Ct. at 2511–12. The basis for this holding was the Court's conclusion that police "inevitably" or "ultimately" would have discovered the victim's body even absent the unconstitutional conduct: a search had been in progress and was suspended only when defendant agreed to cooperate; the area was systematically divided or intended to be divided; and search-team members were three to five hours from

the body's location when the search was suspended. *Id.* at 448–49, 104 S.Ct. at 2511–12.

The *Nix* Court explained the rationale underlying the inevitable discovery doctrine as follows:

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse,* position than they would have been in if no police error or misconduct had occurred.

*Id.* at 443–44, 104 S.Ct. at 2508–09 (emphasis in original). In other words, "[t]he purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct." *Id.* at 443 n. 4, 104 S.Ct. at 2509 n. 4. Relying on the observation that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," and declining "to impose added burdens on the already difficult task of proving guilt in criminal cases by enlarging the barrier to placing evidence of unquestioned truth before juries," the *Nix* Court rejected defendant's argument that the clear-and-convincing evidence standard was appropriate. *Id.* at 444–45 n. 5, 104 S.Ct. at 2509–10 n. 5. Rather, it held that the prosecution must establish inevitable discovery by a preponderance of the evidence in order for the exception to apply. *Id.* at 444, 104 S.Ct. at 2509.

### B. *Nix's Second Circuit Precursors and Progeny*

■ *Nix v. Williams* was important in that it signalled acceptance of a widely recognized exception to the exclusionary rule, 467 U.S. at 440 n. 2, 104 S.Ct. at 2507 n. 2, but the opinion failed to define the precise contours of the inevitability doctrine. *United States v. Cherry,* 759 F.2d 1196, 1204 (5th Cir.1985), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *United States v. Satterfield,* 743 F.2d 827, 846 (11th Cir.1984), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). Recognizing the need to refine the meaning of "inevitable," many courts have looked not only to the Supreme Court case but also to consistent precedent from their circuits. *See, e.g.*

*United States v. Pimentel,* 810 F.2d 366, 369 (2d Cir.1987); *Cherry,* 759 F.2d at 1204; *Satterfield,* 743 F.2d at 846. Six inevitable discovery cases from the Second Circuit—leading up to *United States v. Eng*—help demonstrate the scope and nature of the inevitability doctrine in this circuit. Although none of these cases addresses the analysis appropriate to the particular type of action against *Eng,* they do illustrate the tenacity of the *Nix* Court's overriding concern: that in each case, a court must balance the exclusionary rule's deterrence rationale against an equally compelling public interest in having "juries receive all probative evidence of a crime" that was validly and constitutionally obtained. *See Nix,* 467 U.S. at 443–44, 104 S.Ct. at 2508–09; *Murray,* 487 U.S. at 539–41, 108 S.Ct. at 2534–35.

An examination of *United States v. Alvarez–Porras,* 643 F.2d 54, 59 (2d Cir.), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981), a pre-*Nix* inevitable discovery case from this circuit, is an apt place to begin; although the facts of that case are quite distinct from those before this court, *Alvarez–Porras* discusses the inevitable discovery doctrine in depth and provides a terse and eloquent summary of relevant precedent from the Second Circuit. Defendants in *Alvarez–Porras,* convicted of conspiring to import and distribute substantial quantities of cocaine, challenged the seizure of incriminating evidence as unconstitutional because it occurred prior to the magistrate having signed the search warrant, although after the officers had applied for that warrant. *Id.* at 58–59. Thus, as in many of the later cases discussed below, *Alvarez–Porras* involved a search at a time when the issuance of a warrant was imminent.

·The Second Circuit explained the three related exceptions to the exclusionary rule—attenuation, independent source, and inevitable discovery—as follows:

> Each of these exceptions rests, most basically, on the lack of a sufficiently close connection between the state's wrongdoing and the invasion of the defendant's privacy. Furthermore, despite the identification of discrete headings for the various excep-

tions, their applications and rationales overlap enough that we view them more as helpful guides than as rigid tests. *In each case, we must weigh the extent of any illegality, the probative value of any legally obtained information, and the relationship between the two, always with the hope of vigorously enforcing the Fourth Amendment without imposing ineffective constraints on criminal investigations....* In this complicated area, it is wise[ ] to let the cases speak for themselves and to encourage careful analysis and argument rather than to endorse vague headings which add little to our understanding of the problems and which, because of their symbolic impact, may lead inadvertently to a weakening of the Fourth Amendment's protection.

*Id.* at 60 (emphasis added). Reviewing and comparing the pertinent caselaw from the circuit,[2] *id.* at 60–63, the court cautioned that the precedent should not be read to invite speculation as to a search's probable results:

[Expansively interpreted, the cases above suggest] a broad inevitable-discovery exception whenever a court is satisfied that any government illegality was not the but-for cause of the discovery of any incriminating evidence. In many cases, dictum about a general but-for exception—based on the Supreme Court's phrase in *Wong Sun v. United States, supra,* 371 U.S. at 487, 83 S.Ct. at 417—will not change the result because the related, but separable, independent-source exception also applies. But the difference between the doctrines is crucial. The independent-source exception requires a showing that, even if the constable blundered once, he has taken enough

proper steps that his lawful investigation is not thereby invalidated. A broad but-for exception, on the other hand, encourages speculation on whether a blunderbuss constable *might* eventually have developed a lawful basis for his investigation. A judge would have to conjecture about what the police would have done, or might have done, or could conceivably have done, in deciding whether illegal conduct which led to incriminating evidence was the but-for cause of the seizure. ... At its furthest and most troubling extension, a but-for exception could be used to justify searches simply on the basis of probable cause and reasonableness, without regard for the warrant requirement, because the officers conducting the search were correct in believing they had a lawful basis for the search. ... [W]e will not risk the whittling down of the warrant requirement, without regard for compelling circumstances vel non, by justifying the admission of evidence under a broad inevitable discovery exception to the exclusionary rule.

*Id.* at 63–64. Nevertheless, the *Alvarez–Porras* court declined to suppress the challenged evidence in the case before it because "suppressing the evidence seized would not serve the deterrent purposes of the exclusionary rule." *Id.* at 65–66.

The next pre-*Nix* case that is useful in defining the reasoning and boundaries of the inevitable discovery doctrine is *United States v. Fisher,* 700 F.2d 780 (2d Cir.1983). In that case, Howard Fisher, a convicted felon, purchased assorted handguns by posing as someone named Howard Ashe. After Fisher was convicted for violating the Federal Fire-

---

**2.** *E.g., United States v. Marchand,* 564 F.2d 983, 992 (2d Cir.1977) (holding arrest pursuant to validly issued and executed warrant not invalidated by minor interceding element of illegal police behavior), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Galante,* 547 F.2d 733, 741–42 (2d Cir.1976) (finding that illegal search which led to co-conspirator's cooperation did not taint subsequently seized evidence since "the seizure of the [goods] ... was the product of Cohen's voluntary cooperation" which "broke the chain of causation"), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *Falley,* 489 F.2d at 40 (rejecting claim that illegal search of defendants'

home and illegal seizure of address book containing customs' broker's name mandated reversal of defendants' conviction on narcotics smuggling charges because "[e]ven if the address book had shortened or facilitated the investigation, it did not supply fruit sufficiently poisonous to be fatal."); *United States v. Cole,* 463 F.2d 163 (2d Cir.) (finding IRS's "saturation investigation" of defendant's agency to be sufficiently distinct from illegal FBI wiretap so as not to require reversal because "[c]onduct is not the legal cause of an event if the event would have occurred without it."), *cert. denied,* 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972).

arms Act, he appealed, claiming that admissions he made to Graham, a state investigator, were obtained in violation of his fifth amendment right against compelled self-incrimination. Noting that defendant's statements were never introduced into evidence at trial, the Second Circuit proceeded to analyze the effect that those statements had on the evidence that actually formed the basis for his conviction. *Id.* at 784. The factual link was as follows: Graham forwarded defendant's statements to Agent Varriale of the Federal Bureau of Alcohol Tobacco and Firearms (ATF), who was investigating whether there existed a "radical" source of guns used by criminals shooting police officers, *id.* at 782; based on defendant's statements, Varriale recalled an earlier report concerning a gun purchase by someone named Howard Ashe, *id.* at 784; the ATF agent thereupon initiated his own investigation of Fisher, *id.;* several days later, Fisher was again arrested for gun possession, this time at the New York/Canadian border. *Id.*

Citing *United States v. Crews,* 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980), *Alvarez–Porras, Falley,* and *Cole,* the Second Circuit interpreted the facts of Fisher's case as follows:

> Once Fisher had been arrested, the evidence against him was compiled in a *routine fashion that would inevitably have led to Fisher's discovery.* As Varriale had done in as many as a dozen other Vermont firearms investigations, he asked the major gun dealers in Vermont if they had recorded any purchases by Howard Fisher or Howard Ashe. He displayed a concededly appropriate photo spread to the three dealers with such records, two of whom quickly identified Fisher. Thus we agree with the district court which found that the evidence offered by the Government in support of Fisher's conviction was "derived from sources independent, in any event, from the statements made by the defendant to ... Graham," thereby removing Fisher's statements from the protection of the Fifth Amendment by way of the "inevitable discovery" exception to the exclusionary rule.... Because the discovery of Fisher's crimes was inevitable once he was arrested at the border with a gun pur-

chased in Vermont, any assurance he received from Graham becomes irrelevant since it would not have saved Fisher from federal investigation.

*Id.* at 784 (emphasis added). Thus, in *Fisher,* as in earlier *and* subsequent cases from the Second Circuit, the routine nature of the investigation led the court to determine that illegal evidence inevitably would have been discovered. *Cf. Falley,* 489 F.2d at 41 ("If the evidence produced by the investigation was simply the normal output of that investigation, then the investigative findings have not been tainted directly.").

Following the *Nix* decision, the first case from this circuit to discuss the inevitable discovery doctrine was *United States v. Pimentel,* 810 F.2d 366 (2d Cir.1987). Defendants in that case were indicted for falsifying and concealing material facts from, and making false and fraudulent statements to, the Department of Defense. In connection with this prosecution, the government sought to introduce into evidence two incriminating letters discovered in the course of a post-contract audit. *Id.* at 367. The district court found that the auditor had violated defendants' constitutional rights by removing these letters from defendants' files without their consent. *Id.* Recognizing the auditor's clear right to examine the letters in the course of his audit, *id.,* the trial court nevertheless held that the inevitable discovery doctrine did not apply to direct but only to indirect products of an illegal search. *Id.* at 368.

The government appealed this ruling, and the Second Circuit reversed, concluding that the ongoing audit "surely would have uncovered the letters at issue," and that the *Nix* Court intended the inevitable discovery doctrine to apply to all products of a search, whether direct or indirect. *Id.* at 369. While recognizing that some of its sister courts had advanced a flexible test for inevitable discovery, the *Pimentel* court found that the facts of the case before it did not necessitate decision on this matter, stating:

> Judge Bownes [of the First Circuit], who wrote the opinion in *[U.S. v.] Silvestri* [787 F.2d 736 (1st Cir.1986) ] ... held that,

rather than setting up an "inflexible 'ongoing' test," the "analysis [should] focus on the questions of independence and inevitability and remain flexible enough to handle the many different fact patterns which will be presented." 787 F.2d at 746. Since there is no need to apply Judge Bownes' flexible test to the facts of the instant case, we see no need to reach out and adopt it. *Id.* at 369. Instead, the Second Circuit examined whether admitting the letters in evidence would encourage fourth amendment abuse and determined, finally, that no such result would ensue. *Id.* (refusing to " 'place an incommensurate burden on the government, unnecessary for the protection of commercial privacy' " that might " 'invit[e] seizure on the chance that it could arguably be converted into an effective vaccination against any future use of such routine records.' ") (*quoting McGarry v. United States,* 388 F.2d 862, 871 (1st Cir.1967).

The next post-*Nix* Second Circuit case to discuss inevitable discovery was *United States v. Whitehorn,* 829 F.2d 1225 (2d Cir. 1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988). In *Whitehorn,* three agents entered defendant's apartment upon just cause, arrested her, and conducted an initial security check of the location which uncovered nothing of evidentiary value. *Id.* at 1227–28. Two of those agents then took Whitehorn to the local FBI office where other officers were preparing an affidavit to obtain a search warrant of her apartment. *Id.* Concern that defendant had triggered an explosive device—stemming from her organization's past terrorist activities—led the officers who had departed from the apartment to request a bomb sweep; despite the supposed urgency of this situation, none of the neighbors were alerted to potential danger and the bomb expert did not arrive for 45 minutes. *Id.* at 1228. When the expert arrived, he and another officer "proceeded to look through every container and envelope" in the apartment, uncovering guns, timing mechanisms, equipment used to make false drivers' licenses and blank social security cards. *Id.* Any evidence of criminality observed during this search was then reported to the agents swearing out the search warrant. *Id.*

Defendant moved to suppress the evidence—including her passport and driver's license—discovered in this warrantless "bomb sweep." *Id.* at 1228–29. The government conceded the illegality of the search but cited the inevitable discovery doctrine as an excuse. *Id.* at 1229. In response, defendant acknowledged that all of the challenged evidence would have been discovered in the subsequent warranted search but argued that the search was tainted by the overbroad warrant. *Id.* The district court denied defendant's motion to suppress, *id.* at 1229–30, and the Second Circuit, after explaining the rationale of *Nix v. Williams,* affirmed as follows:

> We . . . agree with Judge Conner that the requirement of the exception—that the challenged evidence would inevitably have been discovered by lawful means—was met. Agents at the F.B.I. office actually began the warrant application process over an hour before the illegal bomb sweep of Whitehorn's apartment occurred. They had already pinpointed the apartment to be searched. Through interviews with neighbors as well as prior extensive investigation, they knew that two of the apartment's occupants . . . had a history of trafficking in false identification documents, weapons, and explosives. . . . In short, the agents had overwhelming probable cause before the bomb sweep to search the apartment in the belief that it was being used, in Judge Conner's words, as a "safe house" for federal fugitives in which false identification documents and other types of information detected by the bomb sweep reasonably could be expected to be found. Under these circumstances, and given that the agents were then proceeding to secure a warrant which specifically authorized the seizure of the challenged evidence, we conclude that the district court properly denied Whitehorn's motion to suppress the evidence first detected by the bomb sweep.

*Id.* at 1231. Relying on this court's opinion in *United States v. Levasseur,* 620 F.Supp. 624 (E.D.N.Y.1985), *aff'd on other grounds,* 816 F.2d 37 (2d Cir.1987), the *Whitehorn* court rejected defendant's assertion that inclusion in the warrant affidavit of information

from the sweep tainted the entire warrant and all evidence seized as a result of the warrant. *Whitehorn,* 829 F.2d at 1231 (" 'It is well settled that "[t]he ultimate inquiry is not whether the underlying affidavit contained allegations based·on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause." ' ") (*quoting Levasseur,* 620 F.Supp. at 631 n. 2 (*quoting United States v. Lace,* 669 F.2d 46, 49 (2d Cir. 1982))).

A third case following *Nix, United States v. Roberts,* 852 F.2d 671 (2d Cir.), *cert. denied,* 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988), posed the question of whether exceptions to the exclusionary rule apply to motions brought under Rule 41(e) of the Federal Rules of Criminal Procedure for return of property unlawfully seized. *Id.* at 675. In *Roberts,* law enforcement authorities seized an enormous quantity of business records pursuant to an overly broad search warrant that was not supported by probable cause. *Id.* at 672–73. The government argued that the inevitable discovery doctrine of *Nix v. Williams* was one of several exceptions to the exclusionary rule that applied to this illegal search. *Id.* at 675–76. More specifically, the government contended that it would have discovered the documents under a subpoena that it had issued several months prior to the search. The Second Circuit held that exclusionary rule exceptions *do* apply to Rule 41(e) motions but disagreed with the government's application of the inevitable discovery doctrine to this case:

> The mere fact that the government serves a subpoena ... does not mean that it will obtain the documents it requests. A subpoena can be invalid for a variety of reasons, as when it is unduly burdensome, Fed.R.Crim.P. 17(c), when it violates the right against self-incrimination, *United States v. Doe,* 465 U.S. 605, 610–12, 104 S.Ct. 1237, 1241–42, 79 L.Ed.2d 552 (1984), or when it calls for privileged documents. *In re Grand Jury Subpoena Dated Sept. 15, 1983,* 731 F.2d 1032, 1036–37 (2d Cir. 1984). Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or

destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena.

*Id.* at 676. The *Roberts* court therefore concluded that the government had not demonstrated by a preponderance of the evidence that its subpoena inevitably would have resulted in discovery of the challenged documents. *Id.*

*United States v. Gorski,* 852 F.2d 692 (2d Cir.1988), was the first of several cases in this circuit to discuss the inevitable discovery doctrine in the context of an inventory search. Based upon confidential information and after a period of surveillance, FBI agents arrested defendant Gorski and searched the bag that he was carrying. Although the agents had probable cause to believe that the bag contained narcotics, they had neither a warrant nor exigent circumstances to justify their immediate search. Defendant moved to suppress the cocaine discovered in the bag, and the district court denied that motion based on its conclusion that an inventory search at the station inevitably would have revealed the evidence that was subject to suppression. *Id.* at 695. The Second Circuit reversed and remanded as follows:

> The finding that [the] search of the bag at the FBI office would inevitably have led to the discovery of the cocaine is clearly correct. However, there was no evidence to support the further necessary finding that it was inevitable that such an inventory search would be conducted. A thorough review of the record reveals no evidence that such searches were an *invariable, routine procedure* in the booking and detention of a suspect at the particular FBI office involved.... We therefore have no alternative but to reverse the district court's order denying Gorski's motion to suppress the evidence found in the search of the bag and to remand for an evidentiary hearing on the factual issue whether an inventory search of the bag was a routine procedure incident to booking and detention of a suspect at the FBI office in question.

*Id.* at 696 (emphasis added); *see also United States v. Jenkins*, 876 F.2d 1085, 1088–89 (2d Cir.1989) ("[A]ssuming that the government could have taken custody of defendant's suitcase and transported it to FBI headquarters, ... an inventory search, conducted by government agents pursuant to FBI policy, may have been permissible. And this search, in turn, may have satisfied the requirements of the inevitable discovery doctrine ... [H]owever, ... before an inventory search is permissible, the government must have legitimate custody of the property to be inventoried.... Here the government has not yet shown any legitimate custody."), *cert. denied*, —— U.S. ——, 112 S.Ct. 659, 116 L.Ed.2d 751 (1991).[3]

■ Several observations emerge from this series of Second Circuit inevitable discovery cases. First, while courts are concerned that the inevitable discovery exception not erode the exclusionary rule, they also are reluctant to invalidate legitimate law enforcement activities because some tainted technique intrudes on an otherwise valid investigation. To strike a balance between these competing concerns, courts tend to ask whether the case before them is one in which excluding the challenged evidence would serve the deterrent purpose of the exclusionary rule. Second and related, the inevitable discovery doctrine, although unquestionably subjective to some degree, *Eng*, 971 F.2d at 861, requires avoidance of speculation to the extent possible. Consequently, the doctrine is most willingly applied in two types of cases: first and more commonly, when a valid search is imminent—in other words, officers are in the process of obtaining a warrant; second, when the investigation is one that has routine, established procedures that the officer was in the course of following. As the next section demonstrates, *United States v. Eng*, 971 F.2d 854 (2d Cir.1992), confirms these two observations; however,

that case calls upon this court to explain how these observations were properly extended and applied to the particular tax expenditures investigation in question.

## C. *The Shu Yan Eng Remand*

In considering the facts of defendant Eng's case, the Second Circuit refined its interpretation of the inevitable discovery doctrine by clarifying the teaching of *Nix* and its progeny in two important ways. First, the *Eng* court explained that *Roberts*, "[c]ontrary to Eng's contention," did not hold that

> the subpoena power *never* may be relied upon by the government to meet the inevitable discovery burden of proof.... The *per se* prohibition urged by Eng would conflict with the Supreme Court's requirement that the exclusionary rule, and the inevitable discovery exception, should not be employed so as to place the government in a worse position than it would have been in had no unlawful search existed.

*Id.* at 860 (emphasis in original). Cautioning against "hypothesized 'leapfrogging' from one subpoena recipient to the next," the court held that "where the government can demonstrate a substantial and convincing basis for believing that the requisite information would have been obtained by subpoena ... there is no reason why the government may not rely upon the subpoena power as one way it might meet the burden of proving inevitable discovery by a preponderance of the evidence." *Id.*

Second, the *Eng* court voiced agreement with the Fifth Circuit's observation that " '[t]he alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized.' " *Id.* at 861 (*quoting Cherry*, 759 F.2d at 1205 n. 10). Summarizing the Second Circuit inevitable discovery cases, the *Eng* court observed:

---

**3.** In addition, there are several recent district court cases applying the inevitable discovery doctrine. *See United States v. Adarkor*, 1992 WL 320590, 1992 U.S. Dist. LEXIS 16316 (S.D.N.Y. 1992) (denying suppression of documentary evidence from unlawful search of apartment because police inevitably would have discovered evidence on second search, conducted pursuant to defendant's consent; court found "substantial

basis for seeking defendant's consent" to exist); *United States v. Cabassa*, 782 F.Supp. 226, 230 (S.D.N.Y.1992) (holding that inevitable discovery doctrine applies to unconstitutional search of apartment which revealed drugs and drug paraphernalia because, at time search was conducted, agents had probable cause and were in process of obtaining warrant).

[T]he facts of cases applying the inevitable discovery doctrine suggest that proof of inevitability *is made more convincing* when the areas of the search or investigation are well-defined, the government effort is planned and methodical, and a direct causal relationship and reasonably close temporal relationship exist between what was known and what had occurred prior to the government misconduct and the allegedly inevitable discovery of the evidence.

*Id.* at 859 (emphasis added). The *Eng* court did not consider how this observation affects a case which, as a matter of law, requires the government to penetrate defendant's camouflaged financial activity in excruciating detail. Therefore, before specifically applying the inevitable discovery doctrine to each item of evidence admitted at Eng's trial, it is worthwhile to explain how the theory advanced in this case fits within the spectrum of inevitable discovery cases described above.

■ As the Second Circuit acknowledged, the government operates under significant constraints when it attempts to prove a tax evasion case by the expenditures method. *Eng*, 971 F.2d at 856. This method requires the government to amass detailed information concerning all of an accused's expenditures and to conduct a methodical, routine examination of those expenditures together with any available resources. For example, in *United States v. Mastropieri*, 685 F.2d 776 (2d Cir.), *cert. denied*, 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982), a net worth and expenditures case,[4] defendants challenged the government's tax investigation as insufficient. The government determined defendants' financial position by examining 32 separate bank accounts used by defendants; by canvassing 47 banks, 71 brokerage firms, and 13 lending institutions in the vicinity of defendants' residences; by searching property records in Bronx, Nassau, Queens, Kings and Suffolk Counties; by checking IRS, treasury department and county clerk records; and by interviewing various friends and acquaintances of the defendants. *Id.* at 779. Disagreeing with defendants' claim of insufficiency, the court explained:

[T]he Government does enough when, as here, it investigates reasonably possible sources of non-taxable income and explores whatever leads the taxpayers or others may proffer. Once it has thus established a *prima facie* case, the taxpayer "remains quiet at his peril."

*Id.* at 785 (*quoting Holland v. United States*, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)); *see also United States v. Koskerides*, 877 F.2d 1129, 1138 (2d Cir.1989) (quoting *Mastropieri* and holding that government meets its burden of proof in tax evasion case when it "investigates reasonably possible sources of non-taxable income and explores whatever leads the taxpayers or others may proffer"); *United States v. Caswell*, 825 F.2d 1228, 1231 (8th Cir.1987) ("Under the 'cash expenditures' method of proof, the government is required to show either a 'likely source' of the allegedly unreported income or that it has negated all reasonably possible nontaxable sources of income."). From these cases, it is clear that the government's burden of proof in establishing a *prima facie* case of tax evasion using the expenditures method is a heavy one.

Time consuming—often extending over many months—an expenditures investigation generally does not have one crucial event establishing criminality; it is the accumulation of evidence of the absence of legitimate sources of income which would normally permit large expenditures that establishes the criminal activity. *See, e.g., Bianco*, 534 F.2d at 504–06 (finding government's investigation

---

4. The basic difference between the "net worth" and the "expenditures" method has been explained as follows:

The net worth method is used when a taxpayer shows an increase in net worth not derivable from reported income. Since this method "is unavailing against the taxpayer who consumes his self-determined tax free dollars during the year and winds up no wealthier than before," the cash expenditure method was developed to

"reach such a taxpayer by establishing the amount of his purchases of goods and service which are not attributable to the resources at hand at the beginning of the year or to nontaxable receipts during the year."

*Mastropieri*, 685 F.2d at 778 n. 2 (*quoting Taglianetti v. United States*, 398 F.2d 558, 562–63 (1st Cir.1968), *aff'd without discussion of this point*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969)).

sufficiently thorough so as to negate existence of non-taxable funds and uninvestigated leads when investigation included examining probate records and circulating letters to approximately 100 banks, a brokerage house, insurance brokers, doctors, schools, hospitals, the telephone company, the electric company, and an attorney who had performed legal services for defendant); *see also Caswell,* 825 F.2d at 1233 ("extensive investigation of bank records, prior years' tax returns, and the like reveal[ing] no other possible nontaxable sources of income, other than a cash gift ... sufficient ... to allow the jury to infer that there were no other possible sources of income to explain [the defendant's] expenditures"); *United States v. Terrell,* 754 F.2d 1139, 1144–48 (5th Cir.) (in prosecution for tax evasion using "net worth" and "cash-on-hand/expenditures" methods of proof, government satisfied burden of negating non-taxable sources of funds by canvassing public records to determine defendant's holdings, contacting nearly 30 banks, interviewing nearly 300 potential witnesses, questioning third parties involved in transactions with defendant, and tracing all expenditures made by defendant back to their sources to determine how they were purchased), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3505, 87 L.Ed.2d 635 (1985).

Accordingly, when a search occurs in the initial stages of an investigation that necessarily is of such complexity and duration, routine procedures such as those mentioned in *Gorski* and *Fisher* assume heightened significance in determining what *would* have happened in the absence of an illegal search. *Cf. Cole,* 463 F.2d at 174 ("It would be a poor 'saturation investigation' that did not embrace this common method of tax evasion; indeed, one would suppose [that charges for personal expenses] would be among the first items even in an ordinary field audit."). Clearly, obtaining business records, for example, is a recognized investigatory technique in such an investigation. *See McGarry v. United States,* 388 F.2d 862, 867 (1st Cir. 1967) ("To know that records relevant to the status of a business include ledgers, journals, cancelled checks, bank statements, vouchers, corporate minute books, cash receipts and disbursement records, deposit slips ... is

hardly today an occult art. An apprentice investigator would ask for such records."), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969).

Bearing these principles in mind, this court turns to its assigned task: memorializing in detail its determination that the evidence in this case demonstrated that an active and ongoing investigation of Eng's tax violations was in progress at the time of the unlawful search; and then memorializing in detail why it concluded that each piece of evidence challenged by Eng and claimed by the government to be admissible inevitably would have been discovered absent the search of the French Ice Cream Parlor safe. *Id.* at 862.

## II. *Inevitable Discovery Applied*

### A. *Evidence at Trial*

The government's theory of tax evasion at trial was that Eng used money upon which he did not pay taxes to make certain expenditures and acquire certain assets by dealing primarily in money orders. As evidence, the government introduced deposit items from bank accounts of individuals and businesses who received payments from Eng. Specifically, the evidence of Eng's tax evasion included the following:

1. Bank statements and records of defendant's personal bank accounts;

2. Documents relating to defendant's purchase of and mortgage on 134 Gauldy Avenue;

3. Documents relating to a condominium owned by defendant at 141 Division Street;

4. Documents relating to the purchase of a building at 26 Bowery;

5. Records relating to the National Westminster Bank account of Chinese Moon Restaurant, a business owned by defendant;

6. Records relating to cashier's checks deposited into, and wire transfers made to, the National Westminster Bank accounts of two of defendant's businesses, World Express and Chinese Moon;

7. Money orders used by Eng to pay the following expenses:

a. automobile leasing and purchase payments and motor vehicle violations;

b. life insurance payments;

c. taxes;

d. telephone bills;

e. tuition payments;

8. Documents relating to defendant's purchase of certain Florida property, specifically a boat and a condominium.

In the remainder of this opinion, this court examines the particular evidence within each of these categories, which led it to determine that the government "ultimately" or "inevitably" would have discovered the challenged evidence absent the illegal search of the French Ice Cream Parlor safe.

**B. *Active and Ongoing Tax Investigation***

■ As an initial matter, this court found that the agents' illegal search of the French Ice Cream Parlor safe did not "trigger" or "catalyze" the tax evasion investigation of Eng. *See Falley,* 489 F.2d at 41. The original indictment, handed up on October 4, 1989, alleged that between September of 1982 and February of 1988 Shu Yan Eng engaged in a continuing criminal enterprise, as the principal administrator, and that as a result of a continuing series of narcotics violations, Eng derived substantial income and resources in violation of Section 848 of Title 21 of the United States Code. That indictment also accused Eng of conducting financial transactions involving the proceeds of this narcotics trade. There is no question that the narcotics and money laundering investigations were active at the time of the search.

Several pieces of evidence confirmed that the tax investigation of Eng was likewise active and ongoing at that time. First, as the Second Circuit recognized, it is "customary following commencement of narcotics and money laundering investigations [that] the IRS [begin] a tax evasion investigation" of the particular defendant. *Eng,* 971 F.2d at 856. Here, given that defendant was charged with importing and distributing more than 800 pounds of heroin and deriving substantial income from those activities, the government had substantial interest in and motivation to investigate his financial activi-

ties and to seek to forfeit the proceeds from the distribution of that heroin. That on October 18, 1989, the government had filed a complaint *in rem* which sought to seize and forfeit 26 Bowery as property acquired by drug transactions, corroborated this observation.

That the indictment was thereafter superseded to include tax counts did not negate the ongoing nature of the investigation in October of 1989. The government frequently investigates narcotics defendants' possession and expenditure of large sums of money in order to establish participation in narcotics trafficking. For example, in *United States v. Briscoe,* 896 F.2d 1476, 1499–1500 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990), the Seventh Circuit responded as follows to the defendant's contention that his failure to file tax returns was irrelevant to his narcotics prosecution:

> It is well settled that in narcotics prosecutions, a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities.

*See also United States v. St. Prix,* 672 F.2d 1077, 1084 (2d Cir.) ("In a narcotics prosecution, it is well established that the government may introduce evidence of cash purchases coupled with tax evidence tending to show that a defendant had no legitimate source of cash."), *cert. denied,* 456 U.S. 992, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *United States v. Hinton,* 543 F.2d 1002, 1012–13 (2d Cir.1976) (finding relevant to narcotics prosecution evidence of defendants' failure to file tax returns "admitted as a corollary to the Government's presentation of evidence regarding large expenditures made by [defendants] during several of the years in question . . . to negate the existence of any legitimate source for the money . . . expended"), *cert. denied,* 429 U.S. 1051, 97 S.Ct. 764, 50 L.Ed.2d 767 (1977).

Second, Agent Interdonato's testimony and documents admitted at the suppression hearing provided further evidence of the progress of the tax evasion investigation of Shu Yan Eng in October 1989. The agent testified that he commenced this investigation in the Summer of 1989, when he discovered, through an examination of public records, that Eng had purchased a building at 26 Bowery on behalf of a corporation over which he presided. *Tr.* at 78–79. This testimony was corroborated by his notes concerning the title search and the title search documentation. GX 385, 388. Agent Interdonato thereafter took further investigatory steps, including requesting Eng's individual and corporate tax returns, GX 358–73, preparing various subpoenas, GX 381–84, engaging in public records searches. *Tr.* at 170. Furthermore, prior to the search, other agents on the DEA Southeast Asian Task Force were reporting information about Eng's assets to Interdonato. *See Tr.* at 134–35 (information concerning condominium at 141 Division Street); *Tr.* at 114, 171 (information concerning Eng's use of money orders). In sum, the evidence supports this court's original conclusion that the tax evasion investigation was neither spurred nor catalyzed by the illegal search. *See Cole*, 463 F.2d at 173 ("Conduct is not a legal cause of an event if the event would have occurred without it.").

Defendant contended that the government would not have conducted a large-scale investigation into Eng's financial transactions absent the illegal search and that the search therefore tainted the entire investigation. As the Second Circuit noted, this assertion derived from the fact that the government subpoenaed only one bank prior to the search of the safe and that some weeks passed between the search and the issuance of some of the later subpoenas. This court had three responses to defendant's assertion. First, Agent Interdonato testified that he stepped up investigation of Eng's tax evasion after the arrest because there was no longer a danger of alerting Eng to the existence of the tax investigation at that juncture. However, this court agreed with the Second Circuit that the government did not adequately explain why a subpoena to Bowery Bank did not risk this disclosure, nor why it believed

that the banks would not abide by secrecy requests. Accordingly, this first response was least persuasive.

Second and more persuasive was the fact that an examination of Interdonato's investigative activity both prior to and following the search revealed a continuing issuance of subpoenas to ferret out Eng's activities. Those subpoenas were coupled with other investigative techniques during the same time period—for example, examinations of public real estate and tax records, canvassing of banks and other creditors, and inquiries into Eng's various businesses and properties—in order to acquire new information and corroborate information already possessed. These procedures are fully consistent with the cases, discussed above, which describe the type of investigations that typically occur in tax evasion cases using the expenditures method.

■ Third and related, in order to establish the type of behavior that constitutes tax evasion, the government must engage in a lengthy and detailed analysis of the taxpayer's resources and expenditures; thus, although the tax evasion investigation of Eng was still in its formative stages when the illegal search of the safe occurred, the government's motivation to pursue that investigation was compelling, and the agents' behavior in the Summer and Fall of 1989 was consistent with their active pursuit of this investigation. Particularly noteworthy was the short time span between Interdonato's initiation of the tax investigation and the unlawful search of the safe; the agent's investigative activity during that period sharply contrasted with what occurred in a case like *Roberts*, where subpoenas lay dormant for months prior to the unlawful search.

For the foregoing reasons, this court concluded that at the time of the search of the French Ice Cream Parlor safe, the government's investigation was in a sufficiently advanced stage to compel the finding that "alternate means of obtaining the evidence" were "in existence and, at least to some degree, imminent, if yet unrealized" and that "the evidence produced by the investigation was simply the normal output of that investi-

gation." *Eng,* 971 F.2d at 861.[5] Consequently, this court turns to the second prong of the inevitable discovery analysis mandated by the circuit court, 971 F.2d at 862, namely an examination of each item of evidence proffered at the suppression hearing and at trial to determine whether the government inevitably would have discovered that evidence by lawful means absent the illegal search.

### C. *Particularized Findings on Challenged Evidence*

#### 1. *Eng's Personal Bank Accounts*

■ Interdonato commenced his tax evasion investigation long before the unlawful search by requesting Eng's and his wife's personal tax returns in January of 1989 and again in August of 1989. *Tr.* 81–85. The returns, prepared by accountant Wang F. Luk, *Tr.* at 53, showed that Eng maintained personal bank accounts in New York at Bowery Savings Bank, Manhattan Savings Bank, Hang Seng Bank, and National Westminster Bank. *Tr.* at 33, 85–86. However, the tax returns did not provide account numbers for these various accounts. *Tr.* at 86. The mortgage application to Long Island Savings Bank for Eng's residence at 134 Gauldy Street, also obtained by Interdonato prior to the search, confirmed the existence of Eng's account at Manhattan Savings Bank and indicated that he had an account at Citibank. *Tr.* at 173. Based on the reasoning provided below, this court found that all the information obtained from these personal bank accounts was encompassed by the inevitable discovery doctrine of *Nix v. Williams.*

As an initial matter, government exhibits 136–55, obtained via a subpoena served on the Manhattan Savings Bank, GX 380, clearly should not have been suppressed. Interdonato prepared that subpoena in August of 1989, before the search, and served it soon

thereafter—in the autumn of 1989. *Tr.* at 33–35. Documents received from the other banks were slightly more difficult to analyze since there were no pre-search subpoenas issued as to those banks. Nevertheless, this court found three reasons for concluding that Interdonato ultimately would have prepared and served subpoenas for all the bank accounts listed above, even if the illegal search had never taken place.

The first reason was case law indicating the routine course taken in other expenditures investigations. The tax cases discussed earlier in this opinion clearly indicate that in a prosecution for tax evasion which uses the expenditures method of proof, the government must present information of the accused's "assets, sources of money, and cash inflows and outflows" in order to satisfy its *prima facie* burden. *See Mastropieri,* 685 F.2d at 779 (examination of 32 bank accounts used by defendants); *Bianco,* 534 F.2d at 504–06 (letters to approximately 100 banks); *see also Caswell,* 825 F.2d at 1233 (extensive investigation of bank records); *Terrell,* 754 F.2d at 1144–48 (contacting nearly 30 banks). Obtaining bank accounts, these cases demonstrate, is an "invariable" and "routine" means of acquiring this essential information.

The second reason was the copy of Agent Interdonato's pre-search notes, dated August 16, 1989, memorializing a meeting among the agent and several Assistant United States Attorneys working on the civil and criminal investigations of Eng. GX 385. That document justified the finding that Agent Interdonato would have subpoenaed the bank records in that it lists the investigative steps that the DEA Southeast Asian Task Force had yet to take in its pursuit of Eng. Item 3 of that list states "obtain grand jury subpoenas re Banks." GX 385. Clearly, prior to the search, Interdonato possessed an intent

---

**5.** At 971 F.2d at 858, the circuit court would appear to be chastising this court in writing: The district judge initially indicated that he would provide a rather lengthy opinion to support his conclusions. However, the judge later decided not to issue the promised opinion because, in his view, the "inevitable discovery doctrine [gave] rise to a conclusion which I thought was compelled" under the circumstances. He did not elaborate further on any

aspect of the evidence challenged by Eng, or explain what "compelled" his conclusion that each item of evidence inevitably would have been discovered lawfully absent the search. The decision not to issue the "promised opinion" was compelled by an unrelenting criminal docket which included, at that time, *United States v. John Gotti, et al,* in which six "rather lengthy opinions" were written during the early months of 1991.

to contact the banks where Eng held accounts.

The third reason was Interdonato's testimony which corroborated both his intent to issue the subpoenas in question and also confirmed the applicability of the general proposition extracted from the tax evasion cases—that contacting all available banks is a routine part of an expenditures investigation—to Interdonato's tax investigation in particular:

Q: When you are doing an investigation using the expenditure method of proof are bank accounts of interest?

A: Yes. It shows us how the taxpayers were spending his money, if he is utilizing his checking account and given credit for decreases in his account or charged with an increase in his account in the computations.

Q: You would review those records for an analysis of the expenditures as well as nontaxable sources of funds?

A: Yes.

Q: Once you identified bank accounts, what did you do?

A: I would subpoena the banks for all bank records regarding Shu Yan Ng.

*Tr.* at 31–32. His testimony on redirect was similarly corroborative:

Q: Were these accounts subpoenaed after [Eng] was arrested?

A: Yes.

Q: Would you have subpoenaed those accounts in any event based on the information on the tax return and loan application?

A: Yes.

Q: When you subpoenaed both Manhattan Savings Bank and Citibank, what information would you have obtained? ... What was your normal—

A: Everything, signature cards, statements, deposit slips, deposit items, checks drawn on the account.

Q: In an expenditures case, would you invariably obtain all cancelled checks?

A: Yes.

*Tr.* at 173–74. Although the Second Circuit cautioned against reliance on Interdonato's testimony alone, that testimony is "deserving of careful consideration as part of the analysis," 971 F.2d at 862, especially when it is corroborated by both facts and law. Interdonato's investigation *was* sufficiently corroborated by both facts and law as to these accounts to drive this court to conclude that the inevitable discovery doctrine applied.

Finding that Interdonato ultimately would have investigated Eng's bank accounts even if the illegal search never occurred did not complete the inevitable discovery inquiry with respect to information obtained from those accounts, however. As the Second Circuit noted:

An important question is to what extent possession of an account number makes more likely a satisfactory response to a bank subpoena, a point on which Interdonato's testimony appears to be contradictory.

*Eng,* 971 F.2d at 862. The Second Circuit premised this observation on the fact that Interdonato had subpoenaed account records from the Bowery Bank prior to the search, and the bank responded erroneously by stating that it had nothing on file for Eng, his wife, or his ex-wife. *Tr.* at 86, 144. Since providing only account holders' names and social security numbers—and not their account numbers—to the Bowery Bank was unsuccessful and since Interdonato used account numbers found in the illegal search of the French Ice Cream Parlor safe when he served subpoenas on Citibank, Hang Seng Bank, and National Westminster Bank, *Tr.* at 32, 88–91, 173; GX 83–86, defendant argued that account numbers are necessary to subpoena bank accounts.

Both testimony and exhibits presented to this court belied defendant's assertion, and the circuit court's assessment, that Interdonato's testimony was contradictory. First, there was evidence that Eng had closed his account at the Bowery Bank prior to the date of the subpoena. *Tr.* at 144, 180. Accordingly, the erroneous response to this subpoena was of only limited probative value with respect to open accounts. More persuasively, government's exhibit 380, the subpoena for records of Eng's account at Manhattan Savings Bank dated August 16, 1989, contained no reference to an account number:

no number appears on the face of the subpoena for the bank account nor in any of the documents appended to the subpoena. Furthermore, Interdonato testified about this subpoena as follows:

Q: Did there come a time when you subpoenaed the Manhattan Savings Bank?

A: Yes.

Q: When did you subpoena the Manhattan Savings Bank?

A: Probably October of '89, around that time.

Q: Do you have any specific recollection when you subpoenaed the Manhattan Savings Bank.

A: October, November, '89, something like that.

Q: Did you have account numbers when you subpoenaed Manhattan Savings Bank?

A: I don't recall specifically.

Q: Do you have a copy of the subpoena from Manhattan Savings Bank, Shu Yan Ng's bank account?

A: Yes.

\* \* \* \* \* \*

Q: Do you recall when you got a response to that subpoena?

A: Soon after the serving of the subpoena.

Q: What did you get in response?

A: Records regarding some of Shu Yan Ng's accounts at Manhattan Savings Bank.

Q: Which account?

A: I believe two checking accounts and passbook savings account.

Q: Records—can you be more specific?

A: Checking account, monthly statement, deposit items, copies of checks drawn on the account. The saving account, copy of the passbook.

*Tr.* at 86–88; *see also Tr.* at 101, 160–61, 173. Clearly, then, despite the ambiguity surrounding the date on which Interdonato served this subpoena, the absence of account numbers—demonstrated not by testimony but by the document itself—did not affect the bank's response.

In sum, notwithstanding the Bowery Bank's error, the evidence—the Manhattan Savings Bank's response to its subpoena corroborated by Interdonato's testimony and coupled with the unique situation affecting the Bowery account—supported the conclusion that banks will respond to subpoenas based solely on a name or on a name in conjunction with a social security number or employee identification number. *Tr.* at 170. Interdonato knew of the existence of all of the accounts from Eng's pre-search tax returns and mortgage application; he also knew Eng's social security number. Interdonato was armed with sufficient information to subpoena Hang Seng Bank, National Westminster Bank and Citibank, and therefore a subpoena to those banks for information about their accounts inevitably would have resulted in the desired documentation. It is worth mentioning that defendant did not claim—nor was there evidence to support a claim—that these subpoenas were somehow unduly burdensome, violative of the defendant's right against self-incrimination, or in search of privileged documents. *See Roberts,* 852 F.2d at 676. Rather, the government established a "substantial and convincing basis for believing that the requisite information would have been obtained by subpoena." *Eng,* 971 F.2d at 860.

Bearing in mind the inquiry required by this circuit in determining whether evidence would have been inevitably discovered, this court found that "there was an ongoing [investigation] which surely would have uncovered the [documents] at issue." *Pimentel,* 810 F.2d at 369. Furthermore, excluding government exhibits numbered 83–86 and 136–55 would not have served the deterrent purpose of the exclusionary rule. *See id.*

### 2. *American Express Bills and Records*

■ Eng was in possession of American Express cards at the time of his arrest. GX 357. Agent Interdonato subpoenaed and received from American Express all records regarding accounts held by Eng. *Tr.* at 73; GX 4–31. Defendant did not challenge these records.

### 3. *134 Gauldy Avenue*

Eng's 1988 tax returns as well as documents seized from his person at the time of

his arrest showed that Eng resided at 134 Gauldy Avenue in Staten Island New York. GX 357, 362. Prior to Eng's arrest, Interdonato performed a title search on this property which indicated that Eng had a mortgage held by Long Island Savings Bank. *Tr.* at 21–22, 123. A pre-search grand jury subpoena was issued to that bank on September 19, 1989, and it responded later that month by producing Eng's mortgage application and statements evidencing payment history. *Tr.* at 23; GX 132–35. In addition, from the mortgagee's records, Interdonato learned that the Atlantic Mutual Corporation was the mortgage broker for 134 Gauldy; a subpoena to Atlantic Mutual provided Agent Interdonato with Eng's residential loan application and good faith estimate letter. *Tr.* at 27; GX 32, 33. Defendant did not challenge these exhibits.

After a post-search examination of account records from Eng's various personal bank accounts described above, Interdonato determined that Eng had not been using his checking accounts to make mortgage payments. *Tr.* at 24. The unlawful search of the safe confirmed this observation by disclosing numerous money orders payable to Long Island Savings Bank and drawn on a variety of different bank accounts. *Tr.* at 24–26, 123–24; GX 3, 49, 61, 62, 64, 72, 122, 200, 203, 210, 212, 213, 337, 340.

In November of 1989, Interdonato subpoenaed Woodmont Development Corporation, the seller of the 134 Gauldy property, and Albert Temkin, the seller's attorney. *Tr.* at 29, 124. The names of each were revealed by the aforementioned pre-arrest title search. *Tr.* at 21; GX 348. In response to this subpoena, Interdonato received a closing statement, customer ledger, and various money orders and checks paid to Woodmont Development Corp. *Tr.* at 28–29, 124–25; GX 348–55. Defendant argued that since the government failed to investigate Eng's method of payment for the house until November—a month after the search of the safe— the documents obtained as a result of subpoenas to Long Island Savings Bank, Woodmont, and Temkin should have been suppressed as products of the illegal search. In response, the government contended that Interdonato ultimately would have discovered the documents relating to 134 Gauldy, even without the illegal search, because:

> Eng's bank account records showed that Eng was not paying the mortgage from his checking accounts; Interdonato had confidential information prior to the unlawful search that Eng was using money orders to pay many expenses and therefore discovery of the money orders was inevitable because the government's next step in light of this information would have been to obtain the Long Island Savings Bank's deposit items, presumably by subpoena, which would have turned up the money orders.

*Eng,* 971 F.2d at 862. In obedience to the circuit court's remand, this court addresses the following three questions: whether lawful discovery of the bank account records themselves was inevitable; whether Interdonato had pre-search information that Eng was using money orders; and whether, in order to discover this type of money order, one must know where and on what date the money orders were deposited after receipt by the payee. *Id.*

■ As an initial matter, this court already has found that discovery of the accounts was inevitable. Moving to the second question, which similarly applies to much of the challenged evidence discussed below, it was clear that at some point during his investigation Agent Interdonato received information from a confidential source that Eng was using money orders to pay for various expenses. What seemed, at first glance, to be in dispute was whether the agent obtained this information prior to or following the search of the safe:

> Q: You told us this morning on direct examination that a confidential source said that Mr. Ng used money orders to pay for the cars, is that correct?
>
> A: Paid for expenses.
>
> \* \* \* \* \* \*
>
> Q: When you obtained the information from the confidential source that Mr. Ng used money orders to pay for expenses, did you personally conduct that interview

or was that secondhand from a Drug Enforcement Administration agent?

A: *I would say both, I was party to some debriefings and others I wasn't.*

Q: Now, when you learned—Your Honor, I am going to try to ask the question so the agent doesn't divulge the name of the source.

When you were at the debriefing, were there more than one debriefing where payment by money orders was discussed?

A: (No response)

Q: Withdrawn. ·

When did the confidential sources tell you Mr. Ng used money orders to pay for his expenses?

A: Debriefing *I was party to* would have been the summer of 1990.

Q: Did you have information prior to Mr. Ng's arrest and prior to the search of the safe from confidential sources that Mr. Ng used money orders to pay for his expenses?

A: I don't believe so.

*Tr.* at 114 (emphasis added). And then:

Q: What information did you have before the search of the safe about his purchasing money orders?

A: From confidential sources I was told Shu Yan Ng had people purchasing money orders for him.

Q: That is pre-arrest information?

A: Yes.

*Tr.* at 171. Close examination and analysis of the foregoing testimony, elicited on cross and redirect respectively, reconciled the seemingly contradictory statements. On cross, Agent Interdonato indicated that he had two sources of information about money orders: his personal interviews with confidential informants; and other agents' interviews. Clearly, he, himself, did not have the opportunity to debrief the source of the information until 1990, well after the search. However, his testimony on redirect established that prior to the search he had information from other agents that Eng was using money orders.

The third consideration is the information that is necessary to recapture money orders.

The Second Circuit incorrectly believed that Interdonato's testimony indicated that "in order to discover money orders such as those used by Eng to pay Long Island Savings Bank, one must know where and on what date the money orders were deposited after receipt by the payee." *Eng,* 971 F.2d at 863. On cross examination, Agent Interdonato testified as follows:

Q: A money order isn't like a check, you have to have a bank number, a bank, number of the money order and you have to have a date essentially, don't you?

A: To obtain it from the bank to issue it, yes.

Q: Otherwise you have to go to the bank into which it was deposited?

A: Yes.

*Tr.* at 102. Thus, the procedure for obtaining information from the bank of deposit, rather than from the issuing bank, does not require the same information. Other testimony corroborated this observation:

Q: You testified it is the practice of banks to microfilm deposit items. In your experience at the Internal Revenue Service do all banks microfilm deposit items?

A: Yes.

Q: In your experience, have you ever requested a deposit item and not received it?

A: No.

Q: You have been in the Internal Revenue Service for how long?

A: Six years.

\* \* \* \* \* \*

Q: In other words, you [request all deposit slips] armed with the date of a payment, approximate date of a payment and account number, is that correct?

A: Yes.

*Tr.* at 180; *see also Tr.* at 189 and DX A (indicating that microfilming errors do occur).

In sum, Eng's bank records showed that he was not paying his mortgage by check. Given that the tax expenditures method of proof requires a showing of assets and payments and that Interdonato had confidential information that Eng had been using money

orders to pay his expenses, this court found that, even absent the illegal search, the government inevitably would have discovered GX 349–55, documents relating to the closing on 134 Gauldy, that were in the possession of Woodmont and Temkin.[6]

### 4. *141 Division Street*

 Interdonato had confidential information prior to the search that Eng owned a condominium at 141 Division Street in New York City. *Tr.* at 27–28, 132–35. Bank records and the condominium unit number found several days later in the safe confirmed that Eng owned the condominium at 141 Division Street; the safe documents also indicated the identities of the seller (Chu Mui Associates), the seller's attorney (Hass, Greenstein), and Eng's attorney (Po Yuen). *Tr.* at 136–37. Interdonato thereafter commissioned a title search for 141 Division Street, Unit 3, *Tr.* at 132, which revealed this identical information. *Tr.* at 29–31. A subpoena subsequently served on these parties, in November of 1989, produced documents showing that Eng had purchased the condo in December 1988 for $200,000. *Tr.* at 29–31, 136–38; GX 78–82, 356.

The Second Circuit emphasized the fact that Interdonato never wrote down the confidential information he received regarding this property. A careful examination of the agent's testimony concerning the point in his investigation when he learned of the apartment's existence is revealing on this matter, however:

> Q: You didn't know that 141 Division Avenue existed until you got the safe documents, is that correct?
>
> A: That is not true. There was information from confidential sources that Mr. Ng purchased some property on Division Street.
>
> Q: When was that information obtained?

A: Immediately—I would say within a couple days before his arrest.

THE COURT: That information tell you where on Division Street?

THE WITNESS: Yes, 141 Division Street.

> Q: An informant told you that Mr. Ng purchased property at Division Street?
>
> A: I got it from other agents.
>
> Q: You were not present at a debriefing when this information was disclosed, is that correct?
>
> A: That's correct.
>
> Q: Do you have notes of your conversation with other agents concerning the disclosure of that information?
>
> A: I don't believe so, I remember him telling me. And noting it.
>
> Q: Somebody told you that Mr. Ng owns a piece of property at 141 Division Street and you didn't make any notes about that?
>
> A: No. This happened, I would say within a day or two of the arrest.
>
> Q: Did you know when Mr. Ng was going to be arrested?
>
> A: Yes.

\*　　\*　　\*　　\*　　\*　　\*

> Q: Do you recall who the agent was that you spoke to concerning the 141 Division Street?
>
> A: Yes.
>
> Q: Who was that agent?
>
> A: Special Agent Barry Tang.
>
> Q: Can you tell us what Agent Tang told you concerning Mr. Ng's alleged ownership of 141 Division Street?
>
> A: I remember him saying: Tom, we have information that Shu Yan Ng also owns a condominium at 141 Division Street.

\*　　\*　　\*　　\*　　\*　　\*

---

**6.** As to documents—specifically money orders—obtained directly from the safe or from subpoenas served after the suppression hearing seeking to mirror evidence from the safe, defendant's original motion challenged admission of this evidence. Despite representations to the contrary (Government's Brief at 6 & n. 2), the government did not seek to admit any of the money orders for the 134 Gauldy residence into evidence at trial. This court addresses the admissibility of these documents only insofar as they are affected by the issue of money orders generally and declines to make specific findings as to the documents' admissibility for reasons described later in subsection 7 of this discussion.

Q: Did he tell you when he learned this information?

A: I believe it was—that was new, recent information, otherwise I would have known it earlier.

Q: Were you in constant communication with Agent Tang concerning Mr. Ng's investigation?

A: Yes.

*Tr.* at 13–35. This testimony indicated that the government learned of Eng's ownership of the 141 Division Street condominium immediately before the arrest. Although Interdonato did not write the address down, this court found his testimony as to his knowledge of this address credible and fully consistent with his specific recollection of details surrounding his acquisition of this information.

Accordingly, this court concluded that the government inevitably would have discovered the information concerning 141 Division Street even without the search of the French Ice Cream Parlor safe. First, Interdonato ultimately would have investigated this information about the property since the very purpose for his tax evasion investigation was to determine where Eng's money was going. Second, despite defendant's claim that a unit number is necessary in order to conduct a title search, a search using only the condominium address and the owner's name would have revealed that Shu Yan Eng owned Unit Number 3.[7] In sum, then, this court found government exhibits 78–82 obtained from the attorney of the seller of 141 Division Street to fall within the inevitable discovery rule.

5. *26 Bowery and Bowery Mansion Inc.*

 Prior to Eng's arrest, the government possessed confidential information that Eng had an interest in a building located at 26 Bowery and that he presided over a business, Chinese Moon Palace, at that location. *Tr.* at 50, 91–92. In the Summer of 1989, prior to the search of the safe, Interdonato performed a title search on the 26 Bowery building which revealed that it had been sold in December of 1986 by a corporation called 26 Bowery Corp. to a corporation called Bowery Mansion Inc. *Tr.* at 50, 125–132. The title search also revealed the name of the selling corporation's attorney—Ronald De Petris, Esq., *Tr.* at 130—and that Eng was president of Bowery Mansion, the purchasing corporation. *Tr.* at 50, 127, 131.

Interdonato thereafter, but still in the Summer of 1989, requested the Bowery Mansion certificate of incorporation from the State of New York, *Tr.* at 79, and the tax returns for Bowery Mansion and Chinese Moon from the IRS. *Tr.* at 81–82; GX 367–69, 376. At some later date, Interdonato also obtained the Chinese Moon tax returns from Wang F. Luk, defendant's accountant. *Tr.* at 58. Finally, a request to the United Service Abstract Corp. provided Interdonato with the deed for 26 Bowery, GX 341; this deed revealed that Eng's attorneys involved in the purchase of 26 Bowery were Frank Lam and Hwa Min Hsu. *Tr.* at 71, 131, 150. Interdonato acquired all of the above information relating to 26 Bowery prior to the search of the French Ice Cream Parlor safe.

In November of 1989, Interdonato subpoenaed and recovered from De Petris, attorney for 26 Bowery Corp., a closing statement and report on the building, GX 105, and a check drawn on World Express International Holding Corp. to Hwa Min Hsu. *Tr.* at 51; GX 124. A subpoena to Sol Leitner and Frieda Grant—the owners of 26 Bowery—in November of 1989 produced deposit slips, deeds, checks, and the mortgage note. *Tr.* at 52, 145–46; GX 105, 124, 127, 330–35. Also in November of 1989, Interdonato subpoenaed Frank Lam. *Tr.* at 71, 131, 149–50. From Lam, the government obtained the following: money orders from various banks payable to Lam, GX 1, 55, 77, 336; Lam's escrow ledger relating to Bowery Mansion, GX 130; checks reflecting payments on the sale of 26 Bowery, GX 129; and certified checks received by the seller of 26 Bowery at the closing, GX 327–28. *Tr.* at 71–73, 155–56, 157.

The title search, tax returns, and documents provided by the seller and its attorney

---

7. Even assuming that a unit number is a prerequisite, the fact that there were only nine units at that address means that a search of all units to determine their owners is likely if interviews that the agent intended to conduct did not reveal Eng's unit number.

reflected that 26 Bowery was purchased in December 1986 for 1.7 million dollars, half of which was paid at closing and half of which was subject to a mortgage held by the seller. Clearly, even more than with the other properties discussed above, the 26 Bowery building was an important source of information going to Eng's tax responsibilities.

While acknowledging the substantial information possessed by Interdonato as to 26 Bowery prior to the illegal search, the Second Circuit emphasized the fact that Interdonato did not know the names of sellers Leitner and Grant until after that search, *Tr.* at 130:

> The important evidence admitted at trial concerned closing information on the price paid and amount borrowed by Eng to purchase the 26 Bowery building. At least some of the closing information admitted at trial may have been provided only by Leitner and Grant. To the extent that Leitner and Grant were the source of the closing information, inevitable discovery of the evidence in their possession becomes more difficult to prove because their identities were discovered in the search of the safe.

*Eng,* 971 F.2d at 863. In this respect, the circuit court appears to have overlooked evidence from sources other than Interdonato which clearly reveals that misconception. For example, on the same day as Eng's arrest, October 18, 1989, the government sought forfeiture of the 26 Bowery building by filing a complaint *in rem* against the defendant property. (Exh. 2 to Government's Reply Brief) The circuit court was aware of this fact and alluded to it specifically at 971 F.2d at 857. Paragraphs four and five of that complaint state:

> 4. The defendant is owned by Bowery Mansion, Inc. which is a domestic corporation that is wholly owned by Shu Yan Ng. Mr. Ng is the president of the corporation and also the sole shareholder.
>
> 5. Bowery Mansion, Inc. took title to the defendant on December 16, 1986 for the sum of approximately $1,700,000.00. Shu Yan Ng. paid $850,000.00 at the closing and the seller, 26 Bowery Corp., took back a mortgage of $850,000.00. That mortgage

was then assigned to *Sol Leitner,* 1311 Brightwater Avenue, Brooklyn, New York and *Frieda Grant,* 112 Mackenzie Street, Brooklyn, New York, each having an undivided one-half interest.

This complaint confirmed not only that the government was aware of the identities and addresses of Leitner and Grant, but also that the government knew Leitner and Grant had taken back a mortgage from Eng.

In sum, as Interdonato possessed substantial information about the 26 Bowery sale prior to the unlawful search—including the identities of all parties involved—this court found that the government inevitably would have discovered government exhibits 1, 55, 77, 105, 124, 127, 129–30, 327–28, and 330–36. Accordingly, defendant's motion to suppress documents related to Eng's purchase of 26 Bowery was properly denied.

### 6. *Chinese Moon Palace, French Ice Cream, and World Express*

 Intertwined with the purchase of the 26 Bowery building was information relating to Eng's various businesses in or near that location. For example, as mentioned above, confidential sources advised DEA agents that Eng was the president of Chinese Moon Palace, Inc. d/b/a Bowery Restaurant. *Tr.* at 91–92. Either an examination of the corporate tax returns for Chinese Moon, obtained from accountant Luk, *Tr.* at 58, or a Treasury Enforcement Communication System ("TECS") check for deposits over $10,000, GX 374–75; *Tr.* at 36, 94–95, revealed that this business maintained a bank account at National Westminster Bank.

In August of 1989, again prior to the search, Interdonato subpoenaed the National Westminster account records for Chinese Moon, GX 382, and thereafter obtained the following: monthly statements, GX 163, 165, 167; deposit items, GX 164, 168, 170; deposit slips, GX 169; corporate resolutions, GX 162, debit advice reflecting transfers to the Chinese Moon Palace Account, GX 165–66; and a signature card, GX 161. *Tr.* at 36–37, 58–59, 93–94. Some of these materials were forwarded to him immediately, and some took several months to arrive. *Tr.* at 94.

Analysis of these records indicated that cashier's checks, totaling $140,000 and issued by Hang Seng Bank, had been deposited in Chinese Moon's account in June and September of 1987. *Tr.* at 58–59, 148. Specifically, those items included GX 109 ($50,000 cashier's check dated June 23, 1987 and issued by the Hang Seng Bank); GX 113 ($30,000 cashier's check dated September 3, 1987 and issued by the Hang Seng Bank); GX 119 ($50,000 cashier's check dated September 3, 1987 and issued by the Hang Seng Bank); GX 117 ($50,000 cashier's check dated September 7, 1987 and issued by the Hang Seng Bank).

Shortly after Eng's arrest, Interdonato issued a subpoena to Hang Seng bank for records pertaining to these cashier's checks issued by that bank and deposited into Chinese Moon's National Westminster Bank account. In response to that subpoena, he received a series of applications for and copies of the checks. *Tr.* at 58–62; GX 106–08, 112–13, 116–19, 123. Defendant does not challenge exhibits 106–13 or 116–19.

Around the same time, in November of 1989, Interdonato subpoenaed National Westminster for records pertaining to the French Ice Cream Parlor, *Tr.* at 58, 68; GX 175–78,[8] and to World Express International. *Tr.* at 62. Interdonato learned of the existence of World Express through documents received from Leitner and Grant and from Luk. *Tr.* at 146–49. However, Interdonato also learned of World Express from the National Westminster Bank checkbook discovered in Eng's safe. *Tr.* at 146–47. As a result of the National Westminster subpoena and subsequent follow-up subpoenas, Interdonato obtained a series of cashier's checks and wire transfers to Hong Kong Banks. *Tr.* at 62–67, 153–55; GX 37–38, 114–15, 125–26, 179–99, 342–47.[9] He also received information about World Express from Hsu in November, although he knew of Hsu's existence prior to the search. *Tr.* at 151.

As the Second Circuit recognized, Interdonato had detailed knowledge of cashier's checks and fund transfers that related to Chinese Moon and the French Ice Cream Parlor and, more importantly, this knowledge was rooted in pre-search events. *Eng,* 971 F.2d at 863. Since the only step that remained to discovery of the numerous cashier's checks issued by Hang Seng Bank was the "routine" and "invariable" issuance of a subpoena for the types of records that Hang Seng could be expected to—and did in fact—produce, this court found that the inevitable discovery doctrine was properly applied to government exhibits 161–70, 106–09, 112–13, 116–19, 175–78.

Although Interdonato learned of the World Express account at National Westminster

---

**8.** This evidence included an account signature card (GX 175); corporate resolutions (GX 176); monthly statements (GX 177); and deposit tickets and items (GX 178).

**9.** The specific records included: checks drawn on the World Express account (GX 128, 184–85, 191–92, 199); deposit items (GX 183, 187–90, 193, 195–98, 344); a signature card (GX 179); corporate resolutions (GX 180); monthly statements (GX 181, 186); deposit tickets (GX 182); copies of certified checks (GX 194).

National Westminster also supplied the following deposit items: a $100,000 cashier's check issued by Wing Lung Bank Limited on August 20, 1986 (GX 343); a $200,000 cashier's check issued by Wing Lung Bank Ltd on August 20, 1986 (GX 347); a $50,000 cashier's check issued by Kwangtung Provincial Bank on August 22, 1986 (GX 126); a $300,000 wire transfer issued by Bank of Credit and Commerce in October 1986 (GX 37); a $300,000 wire transfer issued by Bank of Credit and Commerce in November 1986 (GX 38); and a $50,000 cashier's check issued by Hang Seng Bank on September 3, 1987 (GX 115).

Finally, subpoenas to the various issuing banks—including the Wing Lung Bank.Limited, the Kwangtung Provincial Bank, the Hang Seng Bank and the Bank of Credit and Commerce—resulted in the following evidence: copies of the applications for the August 20, 1986 $100,000 and $200,000 Wing Lung Bank cashier's checks (GX 342, 345); copies of demand drafts indicating that the August 20, 1986 $100,000 and $200,000 Wing Lung cashier's checks were purchased for cash (GX 343, 346); copies of the August 20, 1986 $100,000 and $200,000 Wing Lung Bank cashier's checks reflecting that those checks were paid (GX 344, 347); a copy of the application for August 22, 1986 $50,000 Kwangtung Provincial Bank cashier's check (GX 125); a copy of the August 22, 1986 $50,000 Kwangtung Provincial Bank cashier's check (GX 126); a copy of the application for the September 3, 1987 $50,000 Hang Seng Bank cashier's check (GX 114); a copy of the September 3, 1987 $50,000 Hang Seng Bank cashier's check (GX 115).

from a checkbook found in Eng's safe, he also learned of that business's account—just as he learned of the account for the French Ice Cream Parlor—from documents provided by Luk and others. While distinguishing between these sources of knowledge is impossible, that task is equally unnecessary because this court found that Interdonato inevitably would have discovered the existence of World Express and its bank account without the unlawful search. First, as more fully set forth above in relation to personal bank accounts and properties, business accounts are a routine source of information in tax expenditures cases. Second and more importantly, Interdonato possessed multiple sources for this information prior to the search, and each of these sources—defendant's accountant and the holder of an $850,-000 mortgage on defendant's property—were inevitable targets of government subpoenas.

Since legitimate investigatory techniques would have revealed the existence of this business, any derivative evidence was not tainted merely because illegally seized documents also led to its discovery. Finding otherwise would offend the rationale of *Nix*, which requires this court to look beyond police misconduct and instead seek to balance " 'the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime . . . by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.' " *Gorski*, 852 F.2d at 695 (*quoting Nix*, 467 U.S. at 443, 104 S.Ct. at 2508). As this court implicitly found that applying the exclusionary rule to government exhibits 37–38, 125–128, 179–99, and 342–47 would have served no deterrent purpose, it therefore reaffirms its denial of defendant's motion to suppress those exhibits.

7. *Equitable Life, NYNEX, New York Military Academy, Automobile Companies and City, State and Federal Agencies*

 The money orders used by Eng to pay the various entities included in this category presented common questions of law and fact. Accordingly, this court first will discuss

how the government knew of Eng's obligations to each entity prior to the search of the safe and what specific information the government obtained from the safe. It then will discuss whether the inevitable discovery exception to the exclusionary rule applied to all or any of this evidence.

a. *Payments for Taxes:* Records of the Internal Revenue Service and the New York State Department of Revenue reflected the date and amount that Eng paid in taxes. *Tr.* at 68. The safe contained evidence that Eng paid his taxes by money order. GX 48, 53–54, 58–59, 74, 339 (money orders payable the IRS); GX 41, 87–89 (money orders payable to the New York State Department of Income Tax). The government offered into evidence at trial deposit items from the banks where state and federal tax payments were deposited.

b. *Payments for Violations:* The safe also contained money orders used by Eng to pay various parking and building violations. *Tr.* at 117–18; GX 56, 57, 65, 66, 68, 206 (money orders payable to the Finance Commission of New York): GX 317, 320 (money orders payable to Parking Violations Bureau). Agent Interdonato testified that he never went to the Parking Violation Bureau to find out whether Eng had any outstanding violations, nor was he in the process of checking parking violations at the time of the search. *Tr.* at 116, 118. He also testified that he had never had to take this investigative step in any of his cases. *Tr.* at 117.

c. *Life Insurance:* At the time of his arrest, defendant had on his person an Equitable Life Insurance card. *Tr.* at 46–47, 142; GX 357. As a result of a post-search subpoena to Equitable Life, the government obtained various documents pertaining to Eng's insurance policy which indicated defendant's premium history. *Tr.* at 47–48, 142; GX 91–93. Defendant did not contest admissibility of these documents. Defendant did challenge money orders payable to Equitable Life that came from the safe, GX 44–45, 47, 60, 67, 90, 202, 204, 207–08, and any evidence derived from those orders.

d. *Tuition Payments:* Agent Interdonato subpoenaed the New York Military Academy after discovering in the safe a teller's check

receipt payable to that institution. *Tr.* at 158–62. In addition, records from Eng's Manhattan Savings Bank accounts, the source of which was pre-search information, revealed that Eng made withdrawals in order to purchase cashier's checks payable to the Academy. *Tr.* at 74, 160–61, 180; GX 155. From the subpoena served upon the Academy, the government received account statements, receipts, and Eng's son's admissions application for the Academy. *Tr.* 74, 159–61; GX 215–17.

e. *NYNEX Payments:* The government retrieved a money order payable to NYNEX from the safe of the French Ice Cream Parlor. *Tr.* at 75; GX 315. However, the government was aware at the time of the arrest that Eng owned a portable telephone, *Tr.* at 75, and seized that phone from him at the arrest. *Tr.* at 75. The government made no pre-search attempt to determine his method of payment for the phone. *Tr.* at 165–66.

f. *Automobile Payments:* Prior to Eng's arrest, Agent Interdonato conducted several searches with the Department of Motor Vehicles. *Tr.* at 4, 98; GX 386–87. From these searches, the agent learned that Eng owned a 1988 Mitsubishi and leased a 1989 Dodge Van and a 1989 Mercedes Benz.[10] *Tr.* at 5, 175. The Department of Motor Vehicles records revealed each car's Vehicle Identification Number ("VIN") which enabled Agent Interdonato to determine the insurance company for that vehicle and the names of the dealerships that sold or leased these cars to Shu Yan Eng. *Tr.* at 4–5, 174–75. Furthermore, when he was arrested, Eng possessed registration receipts for each of these cars. *Tr.* at 176–77; GX 357.

From pre-search information, Agent Interdonato discovered that Bay Ridge Mitsubishi sold the Mitsubishi to Eng and that State Farm Insurance Company insured this vehicle. *Tr.* at 12, 102. Documents seized in the illegal search, specifically money orders and a Manhattan Savings Bank teller's check stub payable to Bay Ridge Mitsubishi, con-

firmed this information. *Tr.* at 99–100; GX 2, 36, 42, 43, 201, 209, 316.[11] It also was confirmed by a teller's check payable to Bay Ridge, GX 154, received from the Manhattan Savings Bank. Thereafter, Agent Interdonato obtained receipts of payments directly from Bay Ridge Mitsubishi which reflected the date and amount of payments made by Eng on the 1988 Mitsubishi as follows: on January 26, 1990, Eng made a payment of $1000; on January 29, 1990, Eng made a payment of $1000; also on January 29, 1990, Eng wrote four checks to Bay Ridge Mitsubishi in the amount of $500, $1000, $7,500 and $8000. *Tr.* at 6, 99; GX 39. Bay Ridge also supplied GX 40, the invoice for this car. *Tr.* at 6–7, 99, 102. An analysis of Eng's checking account failed to reveal any of the checks written to pay for the Mitsubishi. *Tr.* at 20.

A September 7, 1989 DMV computer check showed that the 1989 Dodge Van was registered to Eng. *Tr.* at 5; GX 386–87. In addition, agents in Interdonato's task force had observed this vehicle during surveillance. *Tr.* at 104–05. The DMV report allowed Interdonato to determine that Merion Leasing leased the vehicle to Eng and that New Hampshire Insurance Company insured the vehicle. *Tr.* at 12, 107–09. In November or December of 1989, Merion informed Interdonato that Tilden of New Jersey financed the Dodge. Documents recovered from the safe—various money orders—also pointed to Merion and Tilden of New Jersey. GX 50, 69, 71, 73, 75–76, 121, 211, 214, 319, 321, 325, 338. Tilden of New Jersey provided Interdonato with Eng's lease application, delivery receipt, payment schedule and lease payment history. The lease payment history showed that Eng made a number of payments by money order. GX 329. A review of Eng's checking account revealed no lease payments.

\* \* \*

The categories of evidence listed above presented essentially the same issue to this

---

10. The government did not seek to admit evidence regarding the Mercedes at trial.

11. These documents provided as follows: a $1000 money order was issued by Abacus Federal Savings Bank to Bay Ridge, GX 2; a $7,500

money order was issued by Bank Central Asia, GX 36; a $500 and a $1000 money order were issued by Chemical Bank, GX 42–43, 46; and an $8000 money order was issued by Manhattan Savings Bank, GX 154.

court. In each case, as a result of the concededly unlawful search of the French Ice Cream Parlor safe, the government obtained various money orders documenting how Eng paid his expenses to each of the listed entities. The government did not argue that documents actually seized from the safe were admissible at trial, however. Rather, the government argued in favor of—and presented at trial—deposit records from the banks of each of the above-referenced entities and money orders derived from these records, both of which were obtained via post-search and post-suppression hearing subpoenas.

These deposit records and evidence derived therefrom established the same fact that was shown by the illegally seized money orders: Eng's method of paying his expenses. However, by relying on documents obtained via subpoena rather than documents obtained directly from the safe, the government presented this court with a single inquiry: whether Interdonato would have discovered the *source* of this evidence—in other words, whether he *would have served* these subpoenas or had sufficient information to serve these subpoenas—absent the illegal search of the safe. It is important to note the difference here between using post-search investigative procedures to "validate" evidence obtained as a result of an illegal search, which is improper, *Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747, 755 (9th Cir.1989), and using post-search subpoenas which inevitably would have been served. As defendant acknowledged, the presence or absence of a post-search subpoena is irrelevant to the question of whether the government inevitably would have discovered the evidence absent the primary illegality. Here, the court was faced with determining only the key issue in inevitable discovery: whether, imagining the illegal search never took place, would the government have sought *this* particular information from *this* particular source. Since the answer was yes, the information was admissible because excluding that information would have had no deterrent purpose.

It is worth repeating here several general propositions that affect all of the categories before turning to the individual facts. First,

Agent Interdonato had pre-search information that Eng was paying his expenses by using money orders. Second, the agent had pre-search access to Eng's credit card records and, as this court already has found, access to Eng's personal checking accounts as well. Third, in an expenditures investigation, precedent reveals that along with delving into the accused's bank accounts and property ownership, investigators routinely obtain information about vehicles, tax payments, utility payments, telephone payments and insurance payments. This fact is especially true when a payment is obligatory—for example, tax payments. And fourth, the time period that elapsed between when Agent Interdonato commenced the tax investigation of Eng and when the other agents conducted the illegal search was quite short; the tax investigation began in the summer of 1989, and the search occurred in October. Since Agent Interdonato demonstrated that he was in active pursuit of his leads at the time of the search, this case—and the subpoenas served in it—differ materially from cases in which investigations were at a standstill and subpoenas lay dormant when the illegality occurred. *See, e.g., Eng,* 971 F.2d at 860; *Roberts,* 852 F.2d at 676.

Applying these general propositions, this court implicitly found that the government proved by a preponderance of the evidence that it inevitably would have discovered the majority of the documents described above. First, Interdonato inevitably would have discovered the money orders to the IRS and the New York State Department of Taxation based on the nature of these debts and of this investigation. Second, Interdonato would have discovered the payments to Equitable, NYNEX, the Military Academy, and the automobile insurers, lessor and seller, because of the agent's pre-search knowledge of Eng's obligations for these expenses coupled with the fact that these expenses are routine sources of information and targets of investigation in expenditures cases. However, this court finds by hindsight that the money orders used to pay Eng's parking and building violations should have been suppressed, since Interdonato had no pre-search knowledge that Eng owed these moneys and it is not invariable that an individual would

owe such moneys or that an expenditures investigation would seek out payments of this type. This court's failure to suppress this evidence constituted harmless error, as discussed below.

### 8. *Florida Property*

 The government learned from two sources, one pre-search, that Eng owned a residence at 15 Collingwood Lane in Palm Coast, Florida. First, documents in the French Ice Cream Parlor safe—specifically, a real estate tax bill describing the Florida property, GX 63, 70, and cancelled checks reflecting payments for utilities and real estate taxes, *Tr.* at 119–20; GX 318—showed this ownership. Second, the government learned of the existence of the Florida property from payments for utilities that appeared in Eng's checking accounts. *Tr.* at 38–39, 183. Interdonato also discovered that Eng owned a boat in Florida from a State of Florida registration document found in the safe, *Tr.* at 44–45, 138; prior to the search, the government had no knowledge of Eng's ownership of this boat. *Tr.* at 138, 142.

After the search of the safe, Agent Interdonato ran a title search on the Florida home which revealed Eng as owner and also disclosed the name of the seller (Palm Coast Realty) and the seller's attorney. *Tr.* at 39–40, 120. The agent thereafter subpoenaed Palm Realty and Palm Coast Construction Company and obtained numerous documents from these entities. *Tr.* at 40, 121; GX 218–219, 237–40.[12] Records from Palm Coast Construction led the agent to Barnett Bank, the company's bank of deposit; a January 1990 subpoena to Barnett Bank turned up a deposit slip and various money orders payable to Palm Coast Realty and Palm Coast Construction. *Tr.* at 41–42, 121–22; GX 34–35, 225–236, 241–314.

Together, these documents revealed that Eng purchased his Florida residence on December 31, 1986; he paid the purchase price of $153,424.85 in cash, cashier's checks and 72 $1000 money orders. After determining that Eng did not have a mortgage on the property, Interdonato testified that he would have and did attempt to find out about expenses in connection with that property; he contacted the tax collector for the area but ultimately did not subpoena her bank of deposit because he already possessed money orders for tax payments that had been seized from the safe. *Tr.* 43–44, 122–23; GX 63, 70, 318. From these steps, it is clear that Agent Interdonato followed ordinary, routine investigative techniques to acquire information about the Florida property. The question is whether the search of the safe tainted Interdonato's initial discovery of the property's existence or whether he would have discovered that existence notwithstanding the search.

The government argues that it inevitably would have discovered the existence of the Florida property based on an examination of Eng's checking accounts. *Tr.* at 38–39, 183. Agent Interdonato testified as follows about discovery of this property:

Q: How did you learn about that residence?

A: Several ways, records retrieved from the French Ice Cream Parlor, and in addition payments for utilities through Shu Yan Ng's checking account.

Q: If you had been without benefit of the documents from the French Ice Cream Parlor would you have learned about the Palm Coast, Florida residence?

A: Yes.

Q: Why?

A: Because I examined Shu Yan Ng's checking account and it reflected checks paid to utilities and real estate taxes for the home in Florida.

I would investigate those expenses to see why he is paying the expenses.

*Tr.* at 38–39. Clearly, the checking account records—records that this court already had found to fall within the inevitable discovery

---

**12.** These exhibits include the following: a cashier's report envelope (GX 218); a deposit ticket dated August 1, 1986 (GX 219); money orders drawn on Chinatown Federal Savings payable to Palm Coast Realty (GX 237) which were also found in the illegal search (GX 51–52); money order payable to Palm Coast Abstract and Title Company (GX 238); cashier's checks drawn on Global Union Bank payable to Palm Coast Construction Company (GX 239); and settlement statement for 15 Collingwood Lane (GX 240).

rule—reflected utility payments. While utility and property tax payments in general might not ordinarily be significant, in a tax evasion case of a suspect who resided in Staten Island, payments to Florida companies inevitably would have interested the agent responsible for the expenditures investigation, thereby triggering further inquiry. As described above, a tax expenditures investigation requires minute and exhaustive inquiry into all of a suspect's monetary transactions—both inflows and outflows. *Bianco*, 534 F.2d at 504–06. Ownership of houses, vehicles, and other property is routinely and invariably of tremendous interest in such an investigation, and payments for taxes and utilities are essential means of establishing such ownership. *See id.; Terrell*, 754 F.2d at 1144–48. Agent Interdonato's testimony corroborated this general proposition. This court therefore found that sufficient evidence supported its conclusion of inevitable discovery of government exhibits 34–35, 63, 70, 218–219, 225–314, and 318; allowing admission of this evidence did not undermine the purpose of the exclusionary rule in deterring improper police conduct.

Interdonato investigated Eng's boat ownership as follows. First, he checked with the Florida Department of Natural Resources which revealed that Eng purchased his boat from Flagler County Marine. Interdonato thereafter obtained the purchase agreement for the boat from Flagler; he also learned that Flagler banked with Prosperity Bank of St. Augustine. *Tr.* at 45–46; GX 94. Subpoenas to the bank in January of 1990 revealed money orders used to pay for the boat. *Tr.* at 46, 141–42, 183–91; GX 95–104. Although these post-search investigative procedures were routine and legitimate, the question again is whether Interdonato would have learned of the particular property in the first place since after-the-fact investigatory techniques may not be used to "validate" information derived from an unlawful search. *Eng*, 971 F.2d at 861 (*citing Center Art Galleries*, 875 F.2d at 755). The government contends that because the house in Florida had a marina, Agent Interdonato ultimately would have discovered the boat even without information from the safe. *Tr.* at 79; 177–79. This court should have rejected this argument as too speculative and therefore exhibits 94–104 should have been suppressed. However, while these documents, like the money orders for parking and building violations, should have been suppressed, their introduction into evidence was harmless error since the other evidence at trial provided overwhelming proof that Eng was guilty of tax evasion.

## CONCLUSION

A faithful and sensitive application of the exclusionary rule led this court to conclude that the government had established by a preponderance of the evidence that the information that defendant sought to suppress would ultimately and inevitably have been discovered and acquired by lawful means through independent sources. That conclusion was supported by the facts, known to the government prior to the unlawful search, which gave definition to the areas of inquiry customarily and methodically pursued in a tax investigation focusing on the expenditures method of proof. That conclusion was also supported by the "direct causal relationship and reasonably close temporal relationship" that existed "between what was known and what had occurred prior to the government misconduct" and the evidence that would have been inevitably discovered. *Eng*, 971 F.2d at 859. It is important to note in this regard that Agent Interdonato's investigation commenced in the summer of 1989. He was well along the road of subpoenaing bank and other records when the unlawful search occurred within less than two months after his investigation began. This was not a case, unlike *Roberts*, in which outstanding subpoenas were lying dormant for months prior to the unlawful search with no prospect of producing results. *Eng*, 971 F.2d at 860.

I should also add that although I am mindful that "inevitable discovery analysis inevitably involves some degree of speculation," I have endeavored to avoid such speculation and to "view[ ] affairs as they existed at the instant before the unlawful search [and determine] what *would have happened* had the unlawful search never occurred." *Eng*, 971 F.2d at 861. For the foregoing reasons and based on the above particularized findings of

fact, I concluded that Eng's motion to suppress was properly denied.

SO ORDERED.