UNITED STATES of America, Appellee,

v.

Shu Yan ENG, also known as Ah Shu; Cho–Kuen Wong; King Albeo Kong; Foo Wing Yam; Sue Sang Ong; Hon Keung Ng, Defendants,

Shu Yan ENG, also known as Ah Shu, Defendant–Appellant.

No. 1151, Docket 91–1683.

United States Court of Appeals, Second Circuit.

Submitted May 7, 1993.

Decided June 15, 1993.

Margaret E. Alverson, New York City, for defendant-appellant.

Patricia A. Pileggi, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., E.D. of N.Y., New York City, of counsel), for appellee.

Before: MINER and McLAUGHLIN, Circuit Judges, and MARTIN, District Judge.*

MINER, Circuit Judge:

Defendant-appellant Shu Yan Eng appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Glasser, J.). Eng was convicted, after a jury trial, of tax evasion for the years 1986 through 1988, in violation of 26 U.S.C. § 7201. The district court sentenced Eng to a term of imprisonment of forty-eight months but granted bail pending appeal. The conviction followed the district court's denial of Eng's motion to suppress certain records obtained by the government in an unlawful search and other evidence claimed by Eng to have been derived from materials discovered in that unlawful search. The district court based its denial of Eng's motion on the "inevitable discovery" doctrine, an exception to the exclusionary rule. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

In an opinion filed on July 28, 1992, we vacated the judgment of conviction and remanded the case to the district court "for particularized findings as to the manner in which, if at all, each piece of evidence challenged by Eng, and said by the government to be admissible under the inevitable discovery exception, would have been inevitably discovered." *United States v. Eng*, 971 F.2d 854, 856 (2d Cir.1992). We retained jurisdiction of the appeal pending the completion of the district court's findings. *Id.* at 864. The detailed findings required by our remand

---

* The Hon. John S. Martin, Jr., United States District Judge for the Southern District of New York, sitting by designation.

were provided to us in a seventy-five page "Memorandum and Order" dated March 31, 1993. *See United States v. Eng*, 819 F.Supp. 1198, 1208 (E.D.N.Y.1993).

After considering the district court's factual determinations and reviewing its legal conclusion of inevitable discovery, we accept the particularized findings of the district court and reinstate and affirm the judgment of conviction heretofore entered in the district court.

## BACKGROUND

Because the background facts of this case are provided in detail in our prior opinion, *United States v. Eng*, 971 F.2d 854 (2d Cir. 1992) (*"Eng I "*), we will assume familiarity with them and present a truncated version of the events. In February of 1989, the Drug Enforcement Administration ("DEA") and the Internal Revenue Service ("IRS") began an investigation of Eng for suspected narcotics and money laundering violations based on information provided by confidential informants, who indicated that Eng imported narcotics from the Far East and laundered money through various businesses. As is customary in such matters, the IRS expanded its investigation to include the subject of tax evasion. Commencing in September of 1989, IRS Agent Thomas Interdonato conducted the tax evasion aspect of the investigation.

Using the "expenditures method" of proof, Interdonato began a thorough investigation of Eng's assets, sources of money and cash receipts and expenditures. Prior to the unlawful search of Eng's safe, which produced various incriminating documents and revealed useful information, Interdonato had uncovered information about Eng's personal bank accounts and about the following properties in which Eng had an interest: 134 Gauldy Avenue, 141 Division Street, and 26 Bowery. Interdonato also had information regarding Eng's interest in a business known as the Chinese Moon Palace Restaurant.

On October 18, 1989, Eng was arrested in connection with an indictment charging him with administering a continuing criminal enterprise, money laundering and other narcotics violations. Eng, however, was not charged with tax evasion at that time. On the day of Eng's arrest, authorities seized the 26 Bowery building, the location of the Chinese Moon Palace Restaurant and the French Ice Cream Parlor. Eng's personal safe in the French Ice Cream Parlor unlawfully was searched without a warrant. The materials seized from the safe included: cancelled checks from various bank accounts; customer records of money orders; documents revealing the unit number of a condominium located at 141 Division Street; a checkbook of a corporation called World Express International, Inc.; documents revealing that Sol Leitner and Frieda Grant were the previous owners of 26 Bowery Corp.; and documents evidencing ownership of property and a boat in Florida.

After the unlawful search, Interdonato continued his investigation of Eng by issuing subpoenas to banks and other involved entities and by performing title searches of some of Eng's properties. In April of 1990, a superseding indictment, which included three tax evasion counts with respect to the 1986, 1987 and 1988 tax years, was returned. Much of the evidence the government intended to offer at trial to prove the tax violations, Eng argued, either was obtained from the unlawful search or was derived from information that was discovered as a result of the unlawful search. Eng made a motion to suppress the evidence, and the district court denied the motion. Relying on *Nix v. Williams*, the district court concluded that the inevitable discovery doctrine applied and admitted all of the challenged evidence. After a jury trial, Eng was convicted only of the tax evasion charges.

In *Eng I*, we were concerned that there was a possibility that the government's tax evasion investigation was not sufficiently active or developed prior to the illegal search to support the government's claim of inevitable discovery and that the evidence was tainted because the investigation was triggered or catalyzed by the unlawfully obtained information. Moreover, we concluded that, even if the district court determined that the investigation had been active and ongoing, the district court would still be required to analyze and explain in detail how

each piece of evidence inevitably would have been discovered absent the illegal search of Eng's safe. After setting forth our concerns as they related to specific assets, we vacated Eng's judgment of conviction and remanded the case to the district court for particularized findings supporting the district court's conclusion that the challenged evidence inevitably would have been discovered. As this panel retained jurisdiction of the appeal pending completion of the district court's findings, we now consider those findings.

## DISCUSSION

### A. Inevitable Discovery Doctrine

■ The inevitable discovery doctrine is an exception to the exclusionary rule and allows unlawfully obtained evidence to be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509. "For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent the government misconduct." *Eng I,* 971 F.2d at 859; *see Murray v. United States,* 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988); *see also Nix,* 467 U.S. at 448, 104 S.Ct. at 2511. "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Eng I,* 971 F.2d at 861 (emphasis in original). "[P]roof of inevitable discovery 'involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment* and does not require a departure from the usual burden of proof at suppression hearings.'" *Id.* at 859 (emphasis in *Eng I* ) (quoting *Nix,* 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5).

■ We review the district court's factual findings under a clearly erroneous standard. *See United States v. Mast,* 735 F.2d 745, 749 (2d Cir.1984); *see also United States v. Six Hundred Thirty–Nine Thousand Five Hundred and Fifty–Eight Dollars ($639,558) in*

*U.S. Currency,* 955 F.2d 712, 721 (D.C.Cir. 1992).

### B. The District Court's Findings

#### 1. Active and Ongoing Tax Investigation

The district court found that, at the time of the unlawful search, the government was involved in an ongoing investigation of Eng's narcotics violations, which necessarily and customarily included an investigation of his finances in relation to the proceeds of the narcotics trade. Such an inquiry would typically, and did in fact, lead to an investigation of Eng's tax returns. The district court found: "That the indictment was thereafter superseded to include tax counts did not negate the ongoing nature of the investigation in October of 1989." *United States v. Eng,* 819 F.Supp. 1198, 1211 (E.D.N.Y.1993) ("*Eng II* "). We agree.

To support this finding, the district court referred to Agent Interdonato's testimony and documents admitted at the suppression hearing that related to the status of the tax evasion investigation at the time of Eng's arrest in October of 1989. The district court relied particularly on: Interdonato's testimony that he commenced the investigation in the summer of 1989 and discovered from public records that Eng had purchased a building at 26 Bowery on behalf of a corporation of which he was president; information from the title search of 26 Bowery; the request for Eng's personal and corporate tax returns; the preparation of various subpoenas; and the fact that other agents on the DEA Southeast Asian Task Force were reporting information about Eng's assets to Interdonato.

To further support its findings, the district court made the following observation regarding the nature of tax evasion investigations in general:

> [I]n order to establish the type of behavior that constitutes tax evasion, the government must engage in a lengthy and detailed analysis of the taxpayer's resources and expenditures; thus, although the tax evasion investigation of Eng was still in its formative stages when the illegal search of the safe occurred, the government's moti-

vation to pursue that investigation was compelling, and the agents' behavior in the Summer and Fall of 1989 was consistent with their active pursuit of this investigation.

*Id.* at 1212. Specific to this investigation, the district court noted the short time span between the initiation of the investigation and the illegal search and the degree of investigative activity during that period (i.e., there were no subpoenas lying dormant for months prior to the illegal search as in *United States v. Roberts*, 852 F.2d 671 (2d Cir.), *cert. denied*, 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988)). Thus, the district court concluded that "the government's investigation was in a sufficiently advanced stage to compel the finding that 'alternate means of obtaining the evidence' were 'in existence and, at least to some degree, imminent, if yet unrealized' and that 'the evidence produced by the investigation was simply the normal output of that investigation.'" *Eng II*, 819 F.Supp. at 1212–13 (quoting *Eng I*, 971 F.2d at 861). In sum, the district court found, "the evidence supports this court's original conclusion that the tax evasion investigation was neither spurred nor catalyzed by the illegal search." *Eng II*, 819 F.Supp. at 1212.

Eng contends that the district court has engaged in speculation, rather than in an analysis of the demonstrated historical facts in this case, by relying on the customary practices and standard procedures of tax evasion investigations to support its conclusion of inevitable discovery. *See Nix*, 467 U.S. at 457 n. 8, 104 S.Ct. at 2516 n. 8 (Stevens, J., concurring) (the inevitable discovery rule requires a court to assess "the scope of the ongoing investigation which can be objectively verified or impeached"). We think that this argument is without merit.

■ It is evident from the historical and objective facts of Interdonato's investigation before the unlawful search that the agent was immersed in an active and ongoing investigation of Eng that included an examination of financial matters as well as tax returns. Eng was charged with importing and distributing more than 800 pounds of heroin and deriving substantial income from those activities. Accordingly, the government was motivated to obtain additional evidence of Eng's narcotics activities and to seek forfeiture of the proceeds derived from his distribution of heroin. *See United States v. 228 Acres of Land & Dwelling Located on Whites Hill Road in Chester, Vt.*, 916 F.2d 808, 813–14 (2d Cir.1990) (claimant-appellant's "attempts to conceal his income and assets, ... his unexplained accumulation of the substantial cash used to acquire the forfeited parcels, and his demonstrably false claim that he had paid for these parcels with income from businesses on which the 'income taxes were paid,'" were factors establishing probable cause that properties were proceeds traceable to illegal drug activities, as required for civil forfeiture under 21 U.S.C. § 881), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991); *United States v. St. Prix*, 672 F.2d 1077, 1084 (2d Cir.) ("In a narcotics prosecution, it is well established that the government may introduce evidence of cash purchases coupled with tax evidence tending to show that a defendant had no legitimate source of cash."), *cert. denied*, 456 U.S. 992, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); *see also United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir.) ("It is well settled that in narcotics prosecutions, a defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities."), *cert. denied*, 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). The government ultimately did in fact initiate forfeiture proceedings against 26 Bowery and the French Ice Cream Parlor. These proceedings were initiated on the same day as Eng's arrest.

Furthermore, an analysis of the "demonstrated historical facts" leads to the conclusion that the scope of the investigation necessarily would have included a determination of the source of funds used to purchase the known assets. *See Eng I*, 971 F.2d at 861. Those demonstrated facts were: (1) the government, prior to the illegal search, was aware of substantially all of Eng's major

assets (except for the Florida properties) and was aware that Eng used money orders for expenses; and (2) Interdonato already had obtained Eng's personal and corporate tax returns. A careful review of Eng's tax returns logically mandated an investigation of Eng's sources of funds. Although Interdonato participated in the narcotics and money laundering investigation that began in February of 1989, he testified that he commenced his tax evasion investigation in the summer of 1989, when he discovered through the examination of public records that Eng had purchased a building at 26 Bowery on behalf of a corporation of which he was president. Thus, the government's tax evasion investigation was not " 'trigger[ed]' " or " 'catalyzed' " by the information unlawfully gained by the illegal search. *Id.* at 861 (quoting *United States v. Falley*, 489 F.2d 33, 41 (2d Cir.1973) and *United States v. Cole*, 463 F.2d 163, 173–74 (2d Cir.), *cert. denied*, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972)).

Because the tax evasion investigation sufficiently was developed prior to the search of Eng's safe to support the government's inevitable discovery claim, we proceed to our second inquiry—whether the discovery of each piece of challenged evidence " 'would have been' more likely than not 'inevitable' absent the search of Eng's safe." *Eng I*, 971 F.2d at 862 (quoting *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509).

### 2. Particularized Findings for Challenged Evidence

#### a. Eng's Personal Bank Accounts

■ Interdonato obtained the personal tax returns of Eng and his wife well before the illegal search of the safe. The returns revealed that Eng maintained personal bank accounts at Bowery Savings Bank, Manhattan Savings Bank, Hang Seng Savings Bank and National Westminster Bank, but they did not include the bank account numbers. The illegal search revealed the bank account numbers, which we presumed were used in the post-search subpoenas. *See Eng I*, 971 F.2d at 862.

The district court found that evidence in addition to the tax returns, obtained before the illegal search, confirmed the existence of

the bank accounts: the mortgage application to Long Island Savings Bank for 134 Gauldy Street confirmed the existence of the Manhattan Savings Bank account and also indicated the existence of a Citibank account. The district court found that the subpoena served on Manhattan Savings Bank was drafted prior to the illegal search and that information obtained from that subpoena should not have been suppressed. Concerning documents received from the other banks, the district court found three reasons for concluding that subpoenas would have been served even if the search never had taken place: (1) it was the routine course taken in such an expenditure investigation; (2) Interdonato's pre-search notes indicated that he would obtain such subpoenas; and (3) Interdonato testified that he would have subpoenaed the banks. *See Eng II*, 819 F.Supp. at 1213–14.

Eng argues that the district court erred in relying on Interdonato's "intention" to subpoena Eng's banks, as evinced by his notes from an August 16, 1989 meeting, to establish that he inevitably would have contacted them. *See Eng I*, 971 F.2d at 861; *United States v. Cherry*, 759 F.2d 1196, 1205 n. 10 (5th Cir.1985) (the "mere intention to use legal means" does not satisfy a finding of inevitability), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). Rather, Eng asserts, we must inquire whether Interdonato *would* have carried out that intent. In light of: (1) Interdonato's notes and testimony; (2) the fact that one subpoena to Bowery Bank was served prior to the search and one subpoena to Manhattan Savings Bank was drafted prior to the search; (3) the nature of narcotics and tax investigations; and (4) the facts already uncovered in this particular investigation, we agree with the district court that Interdonato indeed would have subpoenaed the other banks.

In response to our specific inquiry as "to what extent possession of an account number makes more likely a satisfactory response to a bank subpoena," *Eng I*, 971 F.2d at 862, the district court found: "banks will respond to subpoenas based solely on a name or on a name in conjunction with a social security number or employee identification number."

*Eng II,* 819 F.Supp. at 1215. Since Interdonato knew Eng's social security number and was aware of all of the personal accounts through the tax returns and mortgage application acquired prior to the search, the district court concluded that Interdonato inevitably would have subpoenaed and received the same documentation and information gained from using the account numbers revealed in the illegal search.

Although it was true that Bowery Bank received a subpoena without account numbers for information concerning any Eng accounts and responded that it had nothing on file, the district court found that this occurrence was due to isolated and unique circumstances—there was evidence that Eng had closed the accounts before the subpoena was issued—and all banks do not follow the same procedures as Bowery Bank in regard to closed accounts. Moreover, the district court noted that the subpoena to Manhattan Savings Bank also contained no reference to an account number but nevertheless was effective in producing information. *See id.* at 1214–15. Thus, the district court sufficiently has addressed our concerns with regard to Eng's personal bank accounts, and we find that it did not err in its factual findings or in its conclusion that the government inevitably would have subpoenaed and obtained information from the banks where Eng maintained accounts.

### b. 134 Gauldy Avenue

■ Prior to the illegal search, Interdonato knew from Eng's 1988 tax returns that Eng resided at 134 Gauldy Avenue and from a title search that Long Island Savings Bank held a mortgage on the property. A pre-search subpoena served on the bank revealed a mortgage application, a payment history and the name of the mortgage broker. The pre-search title examination revealed the name of the seller, Woodmont Development Corp., and the seller's attorney, Albert Temkin. The illegal search produced records of various money orders payable to Long Island Savings Bank for mortgage payments. From a post-search subpoena of Woodmont and Temkin, Interdonato received a closing statement, a customer ledger and various bank money orders and checks paid to Woodmont.

With respect to the customer records of the money orders used by Eng to pay Long Island Savings Bank, the mortgagee of the 134 Gauldy Avenue property, we were concerned with the government's chain of reasoning to find inevitable discovery because (1) it presumed that lawful discovery of the bank account records was inevitable; (2) Interdonato's testimony was conflicting as to whether he had information prior to the illegal search that Eng was using money orders to pay for expenses; and (3) the record was "unclear as to whether Interdonato possessed, or specifically how he would have acquired," information as to "where and on what date the money orders were deposited after receipt by the payee"—the information that Interdonato "seem[ed] to indicate in his testimony" was required to discover the money orders used by Eng to pay Long Island Savings Bank. *See Eng I,* 971 F.2d at 862–63.

Concerning our first inquiry, we already have concluded that the records of Eng's bank accounts inevitably would have been discovered. With regard to our second inquiry, the district court found that Interdonato did possess pre-search information concerning Eng's use of money orders and that his testimony on this issue was not conflicting. The district court found that: prior to the search, Interdonato was informed by other agents that Eng was using money orders; and, after the search, Interdonato obtained the same information from his personal interviews with confidential informants. *See Eng II,* 819 F.Supp. at 1216–17.

Regarding our third concern, the district court found that we "incorrectly believed that Interdonato's testimony indicated that 'in order to discover money orders such as those used by Eng to pay Long Island Savings Bank, one must know where and on what date the money orders were deposited after receipt by the payee.'" *Id.* at 1217. The district court found that, in order to obtain information about a money order from the bank of deposit, rather than from the issuing bank, one needs only the approximate date of payment and the bank of deposit account

number. With regard to the specific money orders payable to Long Island Savings Bank, the district court noted that "the government did not seek to admit any of the money orders for the 134 Gauldy residence into evidence at trial. This court addresses the admissibility of these documents only insofar as they are affected by the issue of money orders generally and declines to make specific findings as to the documents' admissibility." *Id.* at 1218 n. 6. Although it declined to make findings concerning the money orders paid to Long Island Savings Bank, the district court did find that the documents relating to the closing of 134 Gauldy Avenue inevitably would have been discovered:

> Eng's bank records showed that he was not paying his mortgage by check. Given that the tax expenditures method of proof requires a showing of assets and payments and that Interdonato had confidential information that Eng had been using money orders to pay his expenses, this court found that, even absent the illegal search, the government inevitably would have discovered ... documents relating to the closing on 134 Gauldy[ ] that were in the possession of Woodmont and Temkin.

*Id.* at 1217–18.

Since Interdonato, prior to the search, knew the names of the seller (Woodmont) and of the seller's attorney (Temkin) and knew that the property was subject to a mortgage held by Long Island Savings Bank, we agree that Interdonato would have subpoenaed Woodmont, Temkin and Long Island Savings Bank and inevitably would have discovered the closing documents. That Interdonato did not issue these subpoenas until after the search does not negate the fact that his use of the expenditures method of proof would have led him to subpoena these sources so that he could determine how Eng paid for the property. With respect to the money orders payable to Long Island Savings Bank, we need not reach the issue of their inevitable discovery because the district court did not receive them in evidence and the agent inevitably would have discovered the closing documents without knowledge of these specific money orders. We address our broader concern about the inevitable discovery of other money orders below.

### c. The Money Orders

■ Prior to remand, the record was unclear as to how the government inevitably would have discovered "all the various money orders admitted against Eng." *Eng I*, 971 F.2d at 863. The illegal search of Eng's safe revealed records of money orders reflecting payments for: state and federal taxes, parking and building violations, life insurance, tuition for the New York Military Academy, telephone bills and automobiles. At trial, the government did not argue that the records of money orders actually seized from the safe were admissible. The government offered as evidence both the deposit records from the banks where the money orders were deposited by the entities receiving payment and copies of the money orders revealed by those records. The deposit records and money orders were obtained via post-search subpoenas. The district court found that the deposit records and the money orders established the same fact that was shown by the illegally seized money order records—that Eng used money orders to pay his expenses.

In determining whether each of the money orders used by Eng for payment of expenses inevitably would have been discovered, the same question arises: whether Interdonato would have served the subpoenas necessary to obtain the deposit records of the banks where the money orders were deposited. With respect to each piece of evidence, the district court made the following particularized findings: the money orders payable to the IRS and the New York State Department of Taxation inevitably would have been discovered because of the nature of these debts and the nature of the investigation; and Interdonato inevitably would have discovered the payments to Equitable Life, NYNEX and the New York Military Academy and payments for automobile expenses because the agent had knowledge prior to the search of these obligations and expenses and because these expenses are both routine sources of information and targets of investigation in expenditures cases. *Eng II*, 819 F.Supp. at 1224. The district court also

found that the money orders used to pay Eng's parking and building violations should have been suppressed because Interdonato had no knowledge prior to the search that Eng incurred these liabilities and because it was not inevitable that an expenditures investigation would reveal those kinds of payments. However, the district court found the admission of this evidence to be harmless. *See id.* at 1224–25.

We agree with the district court's finding that Interdonato would have subpoenaed the banks that received Eng's payments for taxes, life insurance, tuition, phone bills and automobiles because each of these expenses was known to Interdonato prior to the search. *See id.* at 1222–23 (detailing evidence supporting Interdonato's knowledge of these expenses prior to the search). Given (1) that Interdonato knew from a confidential informant that Eng paid his expenses by using money orders; (2) that Interdonato had access to Eng's credit card records and personal checking accounts prior to the search; (3) that expenditures investigations require the agent to delve into the taxpayer's bank accounts and property ownership, thereby routinely obtaining information about vehicles, tax payments, utility payments and insurance payments; (4) that Interdonato only had commenced his tax investigation of Eng a short time before the illegal search; and (5) that we already have found that Interdonato actively was pursuing his tax investigation of Eng prior to the illegal search, we conclude that Interdonato would have issued the required subpoenas and inevitably would have discovered the money orders. With respect to the money orders for the parking and building violations, we agree with the district court that they inevitably would not have been discovered but that the admission of this evidence was harmless.

#### d. 141 Division Street

■ Prior to the illegal search, Interdonato had obtained confidential information that Eng owned a condominium at 141 Division Street in New York City. From the illegal search of the safe, documents were obtained that: confirmed Eng's ownership of the condominium; revealed the unit number of the condominium; and indicated the identities of the seller, the seller's attorney and Eng's attorney. A subsequent title search of the property revealed the same information. A subpoena served on these parties produced documents showing that Eng purchased the condominium in December of 1988 for $200,-000.

With respect to this property, we were hesitant to apply the inevitable discovery doctrine because we found that it was "not clear whether Interdonato would have taken action on the basis of his pre-search information [from a confidential source], for it appears that this information was not even written down." *Eng I*, 971 F.2d at 863. The district court found that, although Interdonato did not write the address down, his testimony that he knew about the condominium a couple of days before Eng's arrest was "credible and fully consistent with his specific recollection of details surrounding his acquisition of this information." *Eng II*, 819 F.Supp. at 1219. The district court concluded that information concerning the property inevitably would have been discovered without the search of the safe because: (1) "Interdonato ultimately would have investigated this information about the property since the very purpose for his tax evasion investigation was to determine where Eng's money was going"; and (2) a unit number (which Interdonato did not have) was not necessary to conduct a title search—a search using only an address and the owner's name would have revealed that Eng owned unit number three. *Id.* We find that the district court's analysis of Interdonato's recollection of details, the purpose of the investigation, and the fact that the unit number was not necessary to conduct the title search constituted a sufficient focus on demonstrated facts capable of ready verification to make a showing of inevitable discovery.

#### e. 26 Bowery

■ Prior to the seizures at the French Ice Cream Parlor, Interdonato knew from a confidential source, a title search of the building at 26 Bowery, and tax returns filed by Bowery Mansion, Inc. and Chinese Moon Palace Restaurant, Inc.: that Eng had an

interest in 26 Bowery; that he conducted a business, Chinese Moon Palace Restaurant, at that location; that Eng was president of Bowery Mansion, Inc., the corporation that purchased the property; that the name of the selling corporation was 26 Bowery Corp.; that the name of the seller's attorney was Ronald De Petris; and that the names of Eng's attorneys were Frank Lam and Hwa Min Hsu. The illegal search revealed the names of the owners of 26 Bowery Corp.— Sol Leitner and Frieda Grant. A subpoena to Leitner and Grant in November of 1989 produced deposit slips, deeds, checks and a mortgage note.

A subpoena to De Petris produced closing statements and checks drawn on World Express International Holding Corp. A subpoena to Lam produced an escrow ledger and various checks relating to 26 Bowery. The title search, tax returns and documents provided by the seller and De Petris reflected that 26 Bowery was purchased in December of 1986 for 1.7 million dollars, half of which was paid at the closing and the other half of which was paid in the form of a mortgage given to the seller. The district court found that this evidence certainly would have been uncovered absent the illegal search, since "the 26 Bowery building was an important source of information going to Eng's tax responsibilities." *Id.* at 1220.

> We expressed our concern that
>
> [t]he important evidence admitted at trial concerned closing information on the price paid and amount borrowed by Eng to purchase the 26 Bowery building. At least some of the closing information admitted at trial may have been provided only by Leitner and Grant. To the extent that Leitner and Grant were the source of the closing information, inevitable discovery of the evidence in their possession becomes more difficult to prove because their identities were discovered in the search of the safe, and alternate routes to discovery of these parties may be attenuated.

*Eng I*, 971 F.2d at 863. The district court found that we had "overlooked evidence from sources other than Interdonato which clearly reveals that misconception." *Eng II*, 819 F.Supp. at 1220. This evidence establishes:

(1) that on the day of Eng's arrest, the government sought forfeiture of the 26 Bowery building by filing a complaint *in rem* against the property; and (2) that the complaint reflected the government's awareness of the identities and addresses of Leitner and Grant and of the fact that they had taken back a mortgage from Eng. *See id.* Since Interdonato and the government had information concerning the building and the parties involved prior to the search, the district court concluded that all of the information relating to Eng's purchase of 26 Bowery would have been discovered. Considering that all information concerning 26 Bowery would have been essential to Interdonato's tax evasion investigation and that Eng's interest in the property was known prior to the unlawful search, it was inevitable that the unlawfully obtained information would have been discovered.

### *f. Chinese Moon and World Express*

■ Intertwined with the purchase of 26 Bowery was information relating to Eng's other businesses. Information concerning Chinese Moon was obtained from a confidential source. An examination of corporate tax returns and a treasury deposit review revealed that this business had an account at National Westminster Bank.

In August of 1989, prior to the search, Interdonato subpoenaed National Westminster Bank and obtained monthly statements, deposit items, deposit slips, corporate resolutions, debit advice reflecting transfers to the account and a signature card. These records showed that cashier's checks, totaling $140,-000 and issued by Hang Seng Bank, had been deposited in the account in June and September of 1987. In response to a subpoena issued shortly after Eng's arrest, the bank provided Interdonato with copies of the checks.

In November of 1989, subsequent to the illegal search, Interdonato subpoenaed National Westminster for records pertaining to the French Ice Cream Parlor and to World Express International. Interdonato learned of the existence of World Express through documents received from Leitner, Grant and Wang F. Luk, an accountant known by the

government prior to the search, as well as from the National Westminster checkbook discovered in Eng's safe. As a result of the National Westminster subpoena, the agent obtained a series of cashier's checks and wire transfers depositing funds from Wing Lung Bank, Kwantung Bank, and BCCI into the World Express account.

Initially, we found it "possible that discovery of the mere existence of World Express was inevitable [from pre-search known sources such as Luk and Lam, who knew of World Express].... [but] a case for inevitable discovery of the information produced by Wing Lung Bank, Kwantung Bank, and BCCI would appear to involve a far more attenuated chain of events." *Eng I*, 971 F.2d at 863. Considering the district court's findings that business accounts are a routine source of information in tax expenditure cases and that Interdonato possessed multiple sources for this information prior to the search, each of which was an inevitable target of government subpoenas, we conclude that the discovery of World Express indeed was inevitable. With respect to the specific information gained from Wing Lung Bank, Kwantung Bank, and BCCI, we also find that the information inevitably would have been discovered, since it is apparent from the district court's findings that investigations of this nature involve a thorough analysis of all expenditures and receipts of funds into business accounts. Once the investigation uncovered the receipt of funds from these banks, it was inevitable that the government would have issued subpoenas to each of the three banks. In the same regard, the illegally obtained information concerning Chinese Moon also inevitably would have been discovered since the government had information prior to the illegal search regarding Eng's interest in Chinese Moon.

### g. The Florida Properties

■ In considering the record before remand, we found that "[t]he only connection between Interdonato and the Florida properties evident in the record is that provided by the documents found in the safe." *Id.* at 863. These documents identified the address of a house in Florida and Eng's ownership of a boat—information that facilitated a title search and further subpoenas, which led to discovery of the evidence admitted at trial. We expressed further concern that, if our understanding of the record was confirmed by the district court, it would be difficult for the government to meet its burden of proving inevitable discovery of the Florida properties. *Id.* at 864.

The district court found that the government learned from two sources about the house at 15 Collingwood Lane in Palm Coast, Florida: (1) the illegal search produced a real estate tax bill for the property and cancelled checks reflecting payments for utilities and real estate taxes, all of which showed the ownership; and (2) Eng's checking accounts revealed Florida utility payments, which indicated that Eng had an interest in the property. *See Eng II*, 819 F.Supp. at 1225. Concerning the boat, the illegal search revealed a State of Florida registration document, which not only informed the government of the boat's existence but also indicated ownership. Following his search of the safe, Interdonato ran a title search and issued subpoenas, which resulted in acquiring the additional information regarding the Florida property.

The district court found that the utility and property tax payments reflected in the checking account records "in general might not ordinarily be significant, [however,] in a tax evasion case of a suspect who resided in Staten Island, payments to Florida companies inevitably would have interested the agent responsible for the expenditures investigation, thereby triggering further inquiry." *Id.* The district court concluded that, since the checking account records inevitably would have been reviewed, the house inevitably would have been discovered because "[o]wnership of houses, vehicles, and other property is routinely and invariably of tremendous interest in such an investigation, and payments for taxes and utilities are essential means of establishing such ownership." *Id.* at 1226 (citing *United States v. Bianco*, 534 F.2d 501, 504–06 (2d Cir.), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976)). We agree and find sufficient

evidence to support a conclusion of inevitable discovery.

With respect to Eng's ownership of the boat, the district court found that the government's position was "too speculative" and that, although Interdonato's post-search investigative procedures were routine and legitimate, the exhibits concerning the boat should have been suppressed. *Eng II*, 819 F.Supp. at 1226. However, the district court found the admission of evidence with respect to the boat to be harmless error "since the other evidence at trial provided overwhelming proof that Eng was guilty of tax evasion." *Id.* We agree. Although the information regarding Eng's ownership of a boat in Florida would not likely inevitably have been discovered but for the illegal search revealing the registration document, we find that the admission of this evidence was harmless in light of the other evidence properly admitted.

## CONCLUSION

Because the district court's particularized findings are not clearly erroneous and the district court properly concluded that the illegally obtained evidence inevitably would have been discovered, we accept the findings of the district court and reinstate and affirm the judgment of conviction heretofore entered in the district court.